UNITED STATES *v.* PTASYNSKI ET AL.

No. 82–1066.   Argued April 27, 1983—Decided June 6, 1983

POWELL, J., delivered the opinion for a unanimous Court.

*Acting Solicitor General Wallace* argued the cause for the United States.   With him on the briefs were *Acting Assistant Attorney General Murray, Stuart A. Smith, Gary R. Allen,* and *Kristina E. Harrigan.*

*Stephen F. Williams* argued the cause for appellees. With him on the brief for appellees Ptasynski et al. were *William H. Brown, Michael J. Sullivan, Robert F. Nagel,* and *Michael Boudin.   Harold B. Scoggins, Jr.,* and *Gary C.*

*Randall* filed a brief for appellees Independent Petroleum Association et al. *Jim Mattox*, Attorney General, *David R. Richards*, Executive Assistant Attorney General, and *Cynthia Marshall Sullivan*, *Walter Davis*, and *James R. Meyers*, Assistant Attorneys General, filed a brief for appellee State of Texas. *Gene W. Lafitte, George J. Domas, Deborah Bahn Price, David B. Kennedy, William H. Mellor III*, and *Gale A. Norton* filed a brief for appellee State of Louisiana.*

JUSTICE POWELL delivered the opinion of the Court.

The issue is whether excluding a geographically defined class of oil from the coverage of the Crude Oil Windfall Profit Tax Act violates the Uniformity Clause.

## I

During the 1970's the Executive Branch regulated the price of domestic crude oil. See H. R. Rep. No. 96–304, pp. 4–5 (1979). Depending on its vintage and type, oil was divided into differing classes or tiers and assigned a corresponding ceiling price. Initially, there were only two tiers, a lower tier for "old oil" and an upper tier for new production. As the regulatory framework developed, new classes of oil were recognized.[1]

---

*Briefs of *amici curiae* urging reversal were filed by *Matthew J. Zinn* for Atlantic Richfield Co.; by *Jerry N. Gauche* and *Terrence G. Perris* for Standard Oil Co.; by *Norman C. Gorsuch*, Attorney General, and *Deborah Vogt*, Assistant Attorney General, for the State of Alaska; and by *Representative Silvio O. Conte, pro se.*

Briefs of *amici curiae* urging affirmance were filed by *John J. Rademacher* for the American Farm Bureau Federation et al.; by *Wilkes C. Robinson* for the Gulf & Great Plaines Legal Foundation of America et al.; by *David Crump* for the Legal Foundation of America et al.; and by *Daniel J. Popeo* for Senator Don Nickles et al.

[1] In addition to lower- and upper-tier oil, the Federal Energy Administration recognized essentially four other classes of crude oil: stripper oil, Alaska North Slope oil, oil produced on the Naval Petroleum Reserve,

In 1979, President Carter announced a program to remove price controls from domestic oil by September 30, 1981. See *id.*, at 5. By eliminating price controls, the President sought to encourage exploration for new oil and to increase production of old oil from marginally economic operations. See H. R. Doc. No. 96–107, p. 2 (1979). He recognized, however, that deregulating oil prices would produce substantial gains (referred to as "windfalls") for some producers. The price of oil on the world market had risen markedly, and it was anticipated that deregulating the price of oil already in production would allow domestic producers to receive prices far in excess of their initial estimates. See *ibid.* Accordingly, the President proposed that Congress place an excise tax on the additional revenue resulting from decontrol.

Congress responded by enacting the Crude Oil Windfall Profit Tax Act of 1980, 94 Stat. 229, 26 U. S. C. § 4986 *et seq.* (1976 ed., Supp. V). The Act divides domestic crude oil into three tiers[2] and establishes an adjusted base price and a tax rate for each tier. See §§ 4986, 4989, and 4991. The base prices generally reflect the selling price of particular categories of oil under price controls, and the tax rates vary according to the vintages and types of oil included within each tier.[3]

---

and incremental tertiary oil. See H. R. Rep. No. 96–304, p. 12 (1979). Alaska North Slope oil was considered a separate class of oil because its disproportionately high transportation costs forced producers to keep the wellhead price well below the ceiling price. See 42 Fed. Reg. 41566–41568 (1977).

[2] These tiers incorporate to a large extent the categories of oil developed under the Federal Energy Administration's crude-oil pricing regulations. Tier two, for example, includes stripper-well oil and oil from a national petroleum reserve held by the United States. See 26 U. S. C. § 4991(d) (1976 ed., Supp. V).

[3] Generally, the windfall profit is the difference between the current wellhead price of the oil and the sum of the adjusted base price. See 26 U. S. C. § 4988(a) (1976 ed., Supp. V). The amount of the tax is calculated by multiplying the resulting difference by the applicable rate. § 4987(a). The tax on each barrel of oil thus varies according to the adjusted base price and rate, both of which are established by the tier into which the oil is placed.

See Joint Committee on Taxation, General Explanation of the Crude Oil Windfall Profit Tax Act of 1980, 96th Cong., 26–36 (Comm. Print 1981). The House Report explained that the Act is "designed to impose relatively high tax rates where production cannot be expected to respond very much to further increases in price and relatively low tax rates on oil whose production is likely to be responsive to price." H. R. Rep. No. 96–304, at 7; see S. Rep. No. 96–394, p. 6 (1979).

The Act exempts certain classes of oil from the tax,[4] 26 U. S. C. § 4991(b) (1976 ed., Supp. V), one of which is "exempt Alaskan oil," § 4991(b)(3). It is defined as:

> "any crude oil (other than Sadlerochit oil) which is produced—
> "(1) from a reservoir from which oil has been produced in commercial quantities through a well located north of the Arctic Circle, or
> "(2) from a well located on the northerly side of the divide of the Alaska-Aleutian Range and at least 75 miles from the nearest point on the Trans-Alaska Pipeline System." § 4994(e).

Although the Act refers to this class of oil as "exempt Alaskan oil," the reference is not entirely accurate. The Act exempts only certain oil produced in Alaska from the windfall profit tax. Indeed, less than 20% of current Alaskan production is exempt.[5] Nor is the exemption limited to the

---

[4] These classes are defined both by the identity of the producer and the nature of the oil. Section 4991(b)(1), for example, exempts oil produced "from a qualified governmental interest or a qualified charitable interest." Congress determined that because the revenues from this oil would be used by nonprofit entities, it was appropriate to exempt them from the tax. See S. Rep. No. 96–394, pp. 60–61 (1979). The Act also exempts types of oil, such as front-end oil. § 4991(b)(4). Subject to certain conditions, front-end oil is oil that is sold to finance tertiary recovery projects. See § 4994(c).

[5] Of the total amount of oil currently produced in Alaska, 82.6% is subject to the windfall profit tax, 12.4% is exempt from the tax because it is produced from a "qualified governmental interest," see n. 4, *supra*, and

State of Alaska.   Oil produced in certain offshore territorial waters—beyond the limits of any State—is included within the exemption.

The exemption thus is not drawn on state political lines. Rather it reflects Congress' considered judgment that unique climatic and geographic conditions require that oil produced from this exempt area be treated as a separate class of oil. See H. R. Conf. Rep. No. 96–817, p. 103 (1980).   As Senator Gravel explained, the development and production of oil in arctic and subarctic regions is hampered by "severe weather conditions, remoteness, sensitive environmental and geological characteristics, and a lack of normal social and industrial infrastructure."[6]   125 Cong. Rec. 31733 (1979).   These factors combine to make the average cost of drilling a well in Alaska as much as 15 times greater than that of drilling a well elsewhere in the United States.   See 126 Cong. Rec. 5846 (1980) (remarks of Sen. Gravel).[7]   Accordingly, Congress

---

5.1% is exempt because it is "exempt Alaskan oil."   Brief for State of Alaska as *Amicus Curiae* 7.

[6] A particular problem results from the presence of permafrost, which exists throughout the exempt area.   Permafrost is ground that remains frozen continuously, but which will thaw and subside if the surface vegetation insulating it is disturbed.   See University of Alaska, Alaska Regional Profiles, Yukon Region 98–100.   To protect the surface vegetation, the Alaska Department of Natural Resources limits the use of vehicles and machinery to those months when the surface is frozen and covered with snow. Thus, construction and seismic activities are restricted primarily to periods when the climate is at its harshest.   Temperatures of $-40$ to $-50$ degrees Fahrenheit are not uncommon, see *id.*, at 15–16, and what normally might be accomplished with relative ease becomes a demanding task.

[7] The American Petroleum Institute reported comparative costs for drilling wells in Alaska, California, Louisiana, and Texas.   The average cost of an onshore Alaskan well was $3,181,000.   See American Petroleum Institute, 1976 Joint Association Survey on Drilling Costs 12 (1977).   The next highest cost was $292,000 in Louisiana.   See *id.*, at 28–29.   See also Standard & Poor's Industry Surveys, Oil-Gas Drilling and Services, Vol. 150, No. 40, Sec. 1 (Oct. 7, 1982).   Although not identical to Senator Gravel's figures, these sources indicate that the cost of developing oil in Alaska far exceeds that in other parts of the country.   Moreover, because these

chose to exempt oil produced in the defined region from the windfall profit tax. It determined that imposing such a tax "would discourage exploration and development of reservoirs in areas of extreme climatic conditions." H. R. Conf. Rep. No. 96–817, at 103.

Six months after the Act was passed, independent oil producers and royalty owners filed suit in the District Court for the District of Wyoming, seeking a refund for taxes paid under the Act. On motion for summary judgment, the District Court held that the Act violated the Uniformity Clause, Art. I, § 8, cl. 1.[8] 550 F. Supp. 549, 553 (1982). It recognized that Congress' power to tax is virtually without limitation, but noted that the Clause in question places one specific limit on Congress' power to impose indirect taxes. Such taxes must be uniform throughout the United States, and uniformity is achieved only when the tax " 'operates with the same force and effect in every place where the subject of it is found.' " *Ibid.* (quoting *Head Money Cases*, 112 U. S. 580, 594 (1884)).

Because the Act exempts oil from certain areas within one State, the court found that the Act does not apply uniformly throughout the United States. It recognized that Congress could have "a rational justification for the exemption," but concluded that "[d]istinctions based on geography are simply not allowed." 550 F. Supp., at 553. The court then found that the unconstitutional provision exempting Alaskan oil could not be severed from the remainder of the Act. *Id.*, at 554. It therefore held the entire windfall profit tax invalid. *Id.*, at 555.

---

figures represent the cost of an average Alaskan well, they reflect the lower expenses incurred in developing oil in nonexempt areas. They thus understate the costs of drilling in the exempt region.

[8] Article I, § 8, cl. 1, provides:

"The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States."

We noted probable jurisdiction, 459 U. S. 1199 (1983), and now reverse.

## II

Appellees advance two arguments in support of the District Court's judgment. First, they contend that the constitutional requirement that taxes be "uniform throughout the United States" prohibits Congress from exempting a specific geographic region from taxation. They concede that Congress may take geographic considerations into account in deciding what oil to tax. Brief for Taxpayer Appellees 6–7. But they argue that the Uniformity Clause prevents Congress from framing, as it did here, the resulting tax in terms of geographic boundaries. Second, they argue that the Alaskan oil exemption was an integral part of a compromise struck by Congress. Thus, it would be inappropriate to invalidate the exemption but leave the remainder of the tax in effect. Because we find the Alaskan exemption constitutional, we do not consider whether it is severable.

## A

The Uniformity Clause conditions Congress' power to impose indirect taxes.[9] It provides that "all Duties, Imposts and Excises shall be uniform throughout the United States." Art. I, § 8, cl. 1. The debates in the Constitutional Convention provide little evidence of the Framers' intent,[10] but the

---

[9] Article I, § 9, cl. 4, provides that direct taxes shall be apportioned among the States by population. Indirect taxes, however, are subject to the rule of uniformity. See *Hylton* v. *United States*, 3 Dall. 171, 176 (1796) (opinion of Paterson, J.).

[10] The Clause was proposed on August 25 and adopted on August 31 without discussion. See 2 M. Farrand, The Records of the Federal Convention of 1787, pp. 417–418, 481 (1911). When the Committee of Style reported the final draft of the Constitution on September 12, it failed to include the Clause. *Id.*, at 594 (Clause interlined by James Madison). This omission was corrected two days later by appending the Clause to Art. I, § 8, cl. 1. *Id.*, at 614.

The origins of the Uniformity Clause are linked to those of the Port Preference Clause, Art. I, § 9, cl. 6. The two were proposed together, *id.*,

concerns giving rise to the Clause identify its purpose more clearly. The Committee of Detail proposed as a remedy for interstate trade barriers that the power to regulate commerce among the States be vested in the National Government, and the Convention agreed. See 2 M. Farrand, The Records of the Federal Convention of 1787, p. 308 (1911); C. Warren, The Making of the Constitution 567–570 (1928). Some States, however, remained apprehensive that the regionalism that had marked the Confederation would persist. *Id.*, at 586–588. There was concern that the National Government would use its power over commerce to the disadvantage of particular States. The Uniformity Clause was proposed as one of several measures designed to limit the exercise of that power. See 2 M. Farrand, *supra*, at 417–418; *Knowlton* v. *Moore*, 178 U. S. 41, 103–106 (1900). As Justice Story explained:

> "[The purpose of the Clause] was to cut off all undue preferences of one State over another in the regulation of subjects affecting their common interests. Unless duties, imposts, and excises were uniform, the grossest and most oppressive inequalities, vitally affecting the pursuits and employments of the people of different States, might exist. The agriculture, commerce, or manufactures of one State might be built up on the ruins of those of another; and a combination of a few States in Congress might secure a monopoly of certain branches of trade and business to themselves, to the injury, if not to the destruction, of their less favored neighbors." 1 J. Story, Commentaries on the Constitution of the United States § 957 (T. Cooley ed. 1873).

See also 3 Annals of Cong. 378–379 (1792) (remarks of Hugh Williamson); Address of Luther Martin to the Maryland Leg-

---

at 417–418, and reported out of a special committee as an interrelated limitation on the National Government's commerce power, see *id.*, at 437; *Knowlton* v. *Moore*, 178 U. S. 41, 103–106 (1900). They were separated without explanation on September 14 when the Convention remedied their omission from the September 12 draft.

islature (Nov. 29, 1787), reprinted in 3 M. Farrand, *supra*, at 205.

This general purpose, however, does not define the precise scope of the Clause. The one issue that has been raised repeatedly is whether the requirement of uniformity encompasses some notion of equality. It was settled fairly early that the Clause does not require Congress to devise a tax that falls equally or proportionately on each State. Rather, as the Court stated in the *Head Money Cases*, 112 U. S., at 594, a "tax is uniform when it operates with the same force and effect in every place where the subject of it is found."

Nor does the Clause prevent Congress from defining the subject of a tax by drawing distinctions between similar classes. In the *Head Money Cases, supra*, the Court recognized that in imposing a head tax on persons coming into this country, Congress could choose to tax those persons who immigrated through the ports, but not those who immigrated at inland cities. As the Court explained, "the evil to be remedied by this legislation has no existence on our inland borders, and immigration in that quarter needed no such regulation." *Id.*, at 595. The tax applied to all ports alike, and the Court concluded that "there is substantial uniformity within the meaning and purpose of the Constitution." *Ibid.* Subsequent cases have confirmed that the Framers did not intend to restrict Congress' ability to define the class of objects to be taxed. They intended only that the tax apply wherever the classification is found. See *Knowlton* v. *Moore, supra*, at 106;[11] *Nicol* v. *Ames*, 173 U. S. 509, 521–522 (1899).

[11] *Knowlton* v. *Moore* represents the Court's most detailed consideration of the Uniformity Clause. See 178 U. S., at 83–106. The issue in *Knowlton*, however, only presented a variation on the question addressed in the *Head Money Cases*, 112 U. S. 580 (1884). Rather than distinguishing between port and inland cities, the statute at issue in *Knowlton* imposed a progressive tax on legacies and varied the rate of the tax among classes of legatees. The argument was that Congress could not distinguish among legacies or people receiving them; it was required to tax all

The question that remains, however, is whether the Uniformity Clause prohibits Congress from defining the class of objects to be taxed in geographic terms. The Court has not addressed this issue squarely.[12] We recently held, however, that the uniformity provision of the Bankruptcy Clause[13] did not require invalidation of a geographically defined class of debtors. See *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 161 (1974). In that litigation, creditors of bankrupt railroads challenged a statute that was passed to reorganize eight major railroads in the northeast and midwest regions of the country. They argued that the statute violated the uniformity provision of the Bankruptcy Clause because it operated only in a single statutorily defined region. The Court found that "[t]he uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legisla-

---

legacies at the same rate or none. See *Knowlton* v. *Moore*, 178 U. S., at 83–84. In rejecting this argument, the Court reaffirmed its conclusion in the *Head Money Cases* that Congress may distinguish between similar classes in selecting the subject of a tax. 178 U. S., at 106.

Since *Knowlton*, the Court has not had occasion to consider the Uniformity Clause in any detail. See, *e. g.*, *Florida* v. *Mellon*, 273 U. S. 12, 17 (1927); *LaBelle Iron Works* v. *United States*, 256 U. S. 377, 392 (1921).

[12] In *Downes* v. *Bidwell*, 182 U. S. 244 (1901), the Court considered whether Congress could place a duty on merchandise imported from Puerto Rico. The Court assumed that if Puerto Rico were part of the United States, the duty would be unconstitutional under the Uniformity Clause or the Port Preference Clause. *Id.*, at 249. It upheld the duty because it found that Puerto Rico was not part of the country for the purposes of either Clause. *Id.*, at 287.

[13] Article I, § 8, cl. 4, provides that Congress shall have power "To establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." Although the purposes giving rise to the Bankruptcy Clause are not identical to those underlying the Uniformity Clause, we have looked to the interpretation of one Clause in determining the meaning of the other. See *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 160–161 (1974).

tion to resolve geographically isolated problems." *Id.*, at 159. The fact that the Act applied to a geographically defined class did not render it unconstitutional. We noted that the Act in fact had operated uniformly throughout the United States. During the period in which the Act was effective, no railroad reorganization proceeding had been pending outside the statutorily defined region. *Id.*, at 160.

In concluding that the uniformity provision had not been violated, we relied in large part on the *Head Money Cases*, *supra*, where the effect of the statute had been to distinguish between geographic regions. We rejected the argument that "the Rail Act differs from the head tax statute because *by its own terms* the Rail Act applies only to one designated region . . . . The definition of the region does not obscure the reality that the legislation applies to all railroads under reorganization pursuant to § 77 during the time the Act applies." 419 U. S., at 161 (emphasis added).

## B

With these principles in mind, we now consider whether Congress' decision to treat Alaskan oil as a separate class of oil violates the Uniformity Clause. We do not think that the language of the Clause or this Court's decisions prohibit all geographically defined classifications. As construed in the *Head Money Cases*, the Uniformity Clause requires that an excise tax apply, at the same rate, in all portions of the United States where the subject of the tax is found. Where Congress defines the subject of a tax in nongeographic terms, the Uniformity Clause is satisfied. See *Knowlton* v. *Moore*, 178 U. S., at 106. We cannot say that when Congress uses geographic terms to identify the same subject, the classification is invalidated. The Uniformity Clause gives Congress wide latitude in deciding what to tax and does not prohibit it from considering geographically isolated problems. See *Head Money Cases*, *supra*, at 595. This is the substance of our decision in the *Regional Rail Reorganization Act*

*Cases*, 419 U. S., at 156–161.[14]   But where Congress does choose to frame a tax in geographic terms, we will examine the classification closely to see if there is actual geographic discrimination.   See *id.*, at 160–161.

In this case, we hold that the classification is constitutional.   As discussed above, Congress considered the windfall profit tax a necessary component of its program to encourage the exploration for and production of oil.   It perceived that the decontrol legislation would result—in certain circumstances—in profits essentially unrelated to the objective of the program, and concluded that these profits should be taxed.   Accordingly, Congress divided oil into various classes and gave more favorable treatment to those classes that would be responsive to increased prices.

Congress clearly viewed "exempt Alaskan oil" as a unique class of oil that, consistent with the scheme of the Act, merited favorable treatment.[15]   It had before it ample evidence of the disproportionate costs and difficulties—the fragile ecology, the harsh environment, and the remote location—associated with extracting oil from this region.   We cannot fault its determination, based on neutral factors, that this oil required separate treatment.   Nor is there any indication that Congress sought to benefit Alaska for reasons that would offend

---

[14] *Railway Labor Executives' Assn.* v. *Gibbons*, 455 U. S. 457 (1982), is not to the contrary.   There we held that a statute designed to aid one bankrupt railroad violated the uniformity provision of the Bankruptcy Clause.   We stated: "The conclusion is . . . inevitable that [the statute] is not a response either to the particular problems of major railroad bankruptcies or to any geographically isolated problem: it is a response to the problems caused by the bankruptcy of *one* railroad."   *Id.*, at 470 (emphasis in original).   It is clear that in this case Congress sought to deal with a geographically isolated problem.

[15] Congress' view that oil from this area of Alaska merits separate treatment is consistent with the actions of both the Federal Energy Administration, see n. 1, *supra*, and the President, see H. R. Doc. No. 96–107, p. 3 (1979).   See also Staff of the Joint Committee on Taxation, The Design of a Windfall Profit Tax 20–23 (Comm. Print 1979).

the purpose of the Clause. Nothing in the Act's legislative history suggests that Congress intended to grant Alaska an undue preference at the expense of other oil-producing States. This is especially clear because the windfall profit tax itself falls heavily on the State of Alaska. See n. 5, *supra*.

### III

Had Congress described this class of oil in nongeographic terms, there would be no question as to the Act's constitutionality. We cannot say that identifying the class in terms of its geographic boundaries renders the exemption invalid. Where, as here, Congress has exercised its considered judgment with respect to an enormously complex problem, we are reluctant to disturb its determination. Accordingly, the judgment of the District Court is

*Reversed.*