**AUGUSTA TOWING CO., INC., and
Columbia Marine Service,
Inc., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 618–82T.**

United States Claims Court.

April 19, 1984.

William H. Allen, Washington, D.C., for plaintiffs; David Medine and David H. Remes, Covington & Burling, Washington, D.C., of counsel.

Robert S. Watkins, Washington, D.C., with whom were Asst. Attys. Gen. Glenn L. Archer, Jr., Theodore D. Peyser, Jr., and Donald H. Olson, Washington, D.C., for defendant.

## OPINION

NETTESHEIM, Judge.

This case is before the court on cross-motions for summary judgment. Plaintiffs Augusta Towing Service Co., Inc., and Columbia Marine Services, Inc. ("plaintiffs"), challenge the constitutionality of the Inland Waterways Revenue Act of 1978, Pub.L. No. 95–502, 92 Stat. 1696 (codified at 33

U.S.C. §§ 1801–1804 (1982), 26 U.S.C. § 4042 (1982) ) (the "Act"), under the Tax Uniformity clause, the Port Preference clause, and the equal protection component of the Due Process clause of the fifth amendment to the United States Constitution.[1] Plaintiffs seek refunds with interest of taxes paid under the Act on fuel used in operating barges on inland waterways subject to the Act. All amounts sought to be recovered ($2,129.79 in the aggregate) have been fully paid under quarterly returns filed since October 1, 1980.

The Act, which represents the first tax measure applicable to users of inland waterways in the history of the United States,

imposes an ascending tax on fuel used by vessels engaged in "commercial waterway transportation" on any of 26 listed "inland or intracoastal waterway[s]." Revenues collected under the Act are placed in an Inland Waterways Trust Fund to be used for construction and rehabilitation for navigation on the 26 waterways. The Secretaries of Commerce and Transportation are directed to undertake a study of the effects of the Act and report on the advisability of modifying it, including whether any additional waterways should be included in the scheme.[2]

Plaintiffs urge that the only criteria arguably used in the selection of the covered

---

1. The Tax Uniformity clause of U.S. Const., art. I, § 8, cl. 1, provides that "all Duties, Imposts and Excises shall be uniform throughout the United States; ..."

The Port Preference clause, U.S. Const., art. I, § 9, cl. 6, provides that "[n]o Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another; ..."

The fifth amendment to the United States Constitution has been interpreted as incorporating and making applicable to the federal Government the principle of equal protection expressed in the fourteenth amendment injunction that no state shall "deny to any person within its jurisdiction the equal protection of the laws." *Vance v. Bradley,* 440 U.S. 93, 94 & n. 1, 99 S.Ct. 939, 941 n. 1, 59 L.Ed.2d 171 (1979); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

2. 33 U.S.C. § 1801(a) provides:
 Creation of Trust Fund
 There is established in the Treasury of the United States a trust fund to be known as the "Inland Waterways Trust Fund" (hereinafter in this chapter referred to as the "Trust Fund"), consisting of such amounts as may be appropriated or credited to the Trust Fund as provided in this section.
 Section 1802(a) provides:
 In general
 Amounts in the Trust Fund shall be available, as provided by appropriations Acts, for making construction and rehabilitation expenditures for navigation of the inland and intracoastal waterways of the United States described in section 1804 of this title. No amount may be appropriated out of the Trust Fund unless the law authorizing the expenditure for which the amount is appropriated explicitly provides that the appropriation is to be made out of the Trust Fund.
 Section 1803 provides in pertinent part:
 (a) Study directed

The Secretary of Transportation and the Secretary of Commerce, ... shall—
 (1) make a full and complete study with respect to inland waterway user taxes and charges, and
 (2) make findings and policy recommendations with respect thereto.

Such study shall include (but shall not be limited to) a consideration of the matters listed in subsections (b), (c), (d), (e), and (f) of this section.

(b) ... (5) The waterways of the United States (including the Great Lakes, deep draft channels, and coastal ports) which should be included in any system of user taxes and charges....

\* \* \* \* \* \*

(g) Inland waterway user taxes and charges defined
 For purposes of this section, the term "inland waterway user taxes and charges" means taxes imposed on the use of the inland and intracoastal waterways of the United States and all alternatives to such taxes.

\* \* \* \* \* \*

[Section 1804 lists the 26 covered waterways by segment; the segments listed correspond to the project lengths maintained by the Corps of Engineers having a draft of 14 feet or less. The covered rivers are the Alabama-Coosa Rivers, Allegheny River, Apalachicola-Chattahoochee and Flint Rivers, Arkansas River, Atchafalaya River, Atlantic Intracoastal Waterway, Black Warrior-Tombigbee-Mobile Rivers, Columbia River, Cumberland River, Green and Barren Rivers, Gulf Intracoastal Waterway, Illinois Waterway (Calumet-Sag Channel), Kanawha River, Kaskaskia River, Kentucky River, Lower Mississippi River (Baton Rouge to Cairo, Ill.), Upper Mississippi River (Cairo to Minneapolis), Missouri River, Monongahela River, Ohio River, Ouachita-Black Rivers, Pearl River, Red River, Tennessee River, White River, and Willamette River.]

waterways are, as explained by the House Committee on Public Works and Transportation, 1) a depth of 14 feet or less; 2) use by commercial shallow draft vessels; and 3) absorption of "substantial and recurring Federal expenditures for the improvement of navigation." H.R.Rep. No. 95–545, 95th Cong., 1st Sess. 19 (1977). Plaintiffs proffer a list of 50 waterways not covered by the Act which, they contend, satisfy the criteria and some of which satisfy them as well as or better than some of the 26 waterways covered. Therefore, plaintiffs argue, the designation of the 26 waterways was not based on uniform application of any rational criteria and is therefore unconstitutional.

Plaintiffs' arguments under the fifth amendment and Port Preference clause are first addressed. The court next considers whether the Act imposes a tax that is subject to the Uniformity clause.[3] Finally, assuming that the Uniformity clause is appli-

cable, the covered waterways are examined to determine whether the tax is uniform.

## DISCUSSION

### The Equal Protection Clause

Plaintiffs argue that the Equal Protection clause "imposes a limitation on Congress' power to make classifications in legislation" such that "a classification 'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation' in order to avoid violating equal protection." Plfs' Br. filed Feb. 18, 1983, at 28, 30 (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920)). Contrary to this admonition, the class of taxed waterways established by the Act was arbitrarily selected, according to plaintiffs. If the conduct of one person produces different legal consequences from

26 U.S.C. § 4042 provides in pertinent part:
 (a) In general.—There is hereby imposed a tax on any liquid used during any calendar quarter by any person as a fuel in a vessel in commercial waterway transportation.
 [Subsection (b) sets the tax at 4 cents per gallon up to October 1, 1981, with periodic increases up to a maximum ten cents per gallon after September 30, 1985.]
 (c) Exemptions.
 (1) Deep-draft ocean-going vessels.—The tax imposed by subsection (a) shall not apply with respect to any vessel designed primarily for use on the high seas which has a draft of more than 12 feet.
 (2) Passenger vessels.—The tax imposed by subsection (a) shall not apply with respect to any vessel used primarily for the transportation of persons.
 (3) Use by state or local government in transporting property in a state or local business.—Subparagraph (B) of subsection (d)(1) shall not apply with respect to use by a State or political subdivision thereof.
 (4) Use in moving LASH and SEABEE ocean-going barges.—The tax imposed by subsection (a) shall not apply with respect to use for movement by tug of exclusively LASH (Lighter-aboard-ship) and SEABEE ocean-going barges released by their ocean-going carriers solely to pick up or deliver international cargoes.
 (d) Definitions.—For purposes of this section—
 (1) Commercial waterway transportation.—The term "commercial waterway transportation" means any use of a vessel on any inland

or intracoastal waterway of the United States—
 (A) in the business of transporting property for compensation or hire, or
 (B) in transporting property in the business of the owner, lessee, or operator of the vessel (other than fish or other aquatic animal life caught on the voyage).
 (2) Inland or intracoastal waterway of the United States.—The term "inland or intracoastal waterway of the United States" means any inland or intracoastal waterway of the United States which is described in section 206 of the Inland Waterways Revenue Act of 1978 [33 U.S.C. § 1804].

**3.** Defendant noted in its cross-motion filed Oct. 31, 1983, at 7 n. 1, that "[t]he above discussion [arguing the Act's constitutionality under the Tax Uniformity clause] assumes that the levy here in question is a tax or duty within the meaning of the Constitution...." (Citations omitted.) Because defendant's assumption apparently conceded an argument that, if correct, would render unnecessary any inquiry under the Tax Uniformity clause, the court required the parties to brief the issue. As discussed *infra* pp. 166–69, the court concludes that the Act subjects plaintiffs to a user charge and does not impose a duty, impost, or excise tax within the meaning of the Tax Uniformity clause. Plaintiffs' principal argument under the Tax Uniformity clause is examined also, since the parties chose to meet on that ground.

that of another person, "there must be some rational distinction between the persons ... sufficient to warrant [the different treatment].... Since no justification exists for the choice of the 26 waterways, this disparate treatment of identically situated persons is a denial of equal protection." Plfs' Br. filed Feb. 18, 1983, at 31 (citations omitted).

The type of classification the law requires to be rational, however, is the classification of persons, not geographical areas. It is settled that "[t]he Equal Protection Clause relates to equality between persons as such rather than between areas." *Salsburg v. Maryland*, 346 U.S. 545, 551, 74 S.Ct. 280, 283, 98 L.Ed. 281 (1954). Adoption of a law that applies to one territory, but not others, is not necessarily a denial of equal protection to the affected persons. The Equal Protection clause simply means "that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes *in the same place* and under like circumstances." *Missouri v. Lewis*, 101 U.S. 22, 31, 11 Otto 22, 31, 25 L.Ed. 989 (1879) (emphasis added); *see McGowan v. Maryland*, 366 U.S. 420, 427, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) (exemption from Maryland blue laws of retailers in one county upheld; "[T]erritorial uniformity is not a constitutional prerequisite."). As long as all persons consuming fuel in "commercial waterway transportation" on the listed waterways are taxed (subject to the stated exceptions, not challenged here), no violation of equal protection exists.

A different situation is presented by cases in which a class of persons is the object of discrimination based on their place of residence. *E.g., Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (electoral district malapportionment diluting weight of citizens' votes based on place of residence violates equal protection). *Louisiana & Arkansas Ry. v. Goslin*, 258 La. 530, 246 So.2d 852 (1971), relied on by plaintiffs, belongs to this category. That case dealt with the allegation that

citizens of certain counties adjacent to an improved waterway were exempted from a tax levied in support of the waterway because of their residence within those certain counties, while citizens of other counties, who were identically situated with respect to the waterway, had to pay. *See Louisiana & Arkansas Ry. v. Goslin*, 300 So.2d 483 (La.1974), *cert. denied*, 420 U.S. 963, 95 S.Ct. 1356, 43 L.Ed.2d 441 (1975) (affirming dismissal of suit after remand).

*Pennsylvania Bank & Trust Co. v. Hanisek*, 426 F.Supp. 410 (W.D.Pa.1977), in which county sheriffs charged varying commissions in connection with sheriff sales of realty, although state law imposed a uniform fee, would not support an argument that geographical distinctions lacking reasonable basis violate equal protection. Despite dicta indirectly implying that a state would need a rational basis in order to impose different fees for sheriffs' sales in different counties, 426 F.Supp. at 415, a situation with which the court was not faced, the thrust of the opinion stressed the absence of any requirement of territorial uniformity. The court relied heavily on *Manes v. Goldin*, 400 F.Supp. 23 (E.D.N.Y. 1975) (existence of higher court costs in New York City than elsewhere in state did not violate equal protection), which mentioned the need for a rational basis for territorial distinctions only in the context of cases like *Reynolds v. Sims*. In a situation such as that involved in *Manes*, however, the relevant consideration was that "[a]ll persons suing in the courts in New York City pay the same fees whether they are citizens of New York City or of some other state." 400 F.Supp. at 30. There is no suggestion here that any companies engaged in the kinds of barging activities enumerated in the Act on the taxed waterways are objects of discrimination based on their state of incorporation or on any other invidious basis.

Plaintiffs' other cases, involving discrimination between classes of persons, are distinguishable on this ground: *Schweiker v. Wilson*, 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981) (distinction operating

against institutionalized persons upheld); *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (distinction upheld between railroad employees for purposes of receiving retirement benefits based on their "current connection" with railroad); *Rinaldi v. Yeager,* 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966) (incarcerated criminal appellants alone charged costs of appeal in violation of equal protection); *Borden's Farm Products Co. v. Baldwin,* 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281 (1934) (requirement that milk dealers with "well advertised trade names" charge higher prices resulted in cause of action for equal protection); *Louisville Gas & Electric Co. v. Coleman,* 277 U.S. 32, 48 S.Ct. 423, 72 L.Ed. 770 (1927) (tax imposed only on mortgages maturing in five or more years held unconstitutional); *Royster Guano Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920) (tax exemption for local corporations doing all business outside state but not for those doing some business locally held to violate equal protection); *Zeigler v. Jackson,* 638 F.2d 776 (5th Cir.1981) (discharge of convicted police officer while others retained after convictions held to violate equal protection); *Falter v. Veterans' Administration,* 502 F.Supp. 1178 (D.N.J.1980) (allegation that patients at one VA hospital, entitled to equal benefits, endured substandard conditions in violation of equal protection survived motion treated as motion for summary judgment); *Gavett v. Alexander,* 477 F.Supp. 1035 (D.D.C.1979) (discrimination against non-members of National Rifle Association held unconstitutional); *Milnot Co. v. Douglas,* 452 F.Supp. 505 (S.D.W.Va. 1978) (banning of milk product while similar products of other companies allowed to be sold held unconstitutional); *International Association of Firefighters, Local 2069 v. City of Sylacauga,* 436 F.Supp. 482 (N.D.Ala.1977) (disparate promotion procedures between policemen and firefighters held to violate latter's equal protection rights); *Georgia Association of Educators, Inc. v. Nix,* 407 F.Supp. 1102 (N.D.Ga. 1976) (irrationally designed teacher certifi-cation test unconstitutionally discriminated against low scorers); *Milnot Co. v. Arkansas State Board of Health,* 388 F.Supp. 901 (E.D.Ark.1975) (banning of milk product while similar products of other companies allowed to be sold held unconstitutional); *Milnot Co. v. Richardson,* 350 F.Supp. 221 (S.D.Ill.1972) (same); *Ali v. Division of New York State Athletic Commission,* 316 F.Supp. 1246 (S.D.N.Y.1970) (denial of license renewal to convicted boxer while other convicted boxers' licenses were renewed held to violate equal protection).

No violation of equal protection is presented by plaintiffs' claim.

*The Port Preference Clause*

 Plaintiffs argue that the Port Preference clause has been violated because all ports of West Virginia, Kentucky, Tennessee, Iowa, Missouri, Arkansas, Oklahoma, Kansas, and Nebraska are situated within taxed waterways and therefore adversely affected by the Act, whereas none of the ports of Hawaii, Alaska, California, New York, New Jersey, Connecticut, Rhode Island, Massachusetts, Maine, Maryland, and Michigan are on taxed waterways. In other states, some ports are on taxed waterways, and some are not. While it may be true that the ports of some states are indirectly disadvantaged compared to the ports of other states because fuel used on the waterways leading to them is taxed, this fact does not bring the tax within the constitutional prohibition. Acts of Congress that only incidentally benefit some ports at the expense of others do not confer a preference on the ports of one state over those of another within the meaning of the clause.

 The Port Preference clause has been narrowly construed by the Supreme Court, *see United States v. Tobin,* 195 F.Supp. 588, 607 & n. 85 (D.D.C.1961), *rev'd on other grounds,* 306 F.2d 270 (D.C. Cir.), *cert. denied,* 371 U.S. 902, 83 S.Ct. 206, 9 L.Ed.2d 165 (1962), so as only to prohibit *"positive legislation"* intended to produce "a direct privilege or preference of the ports of any particular State over those

**166**

of another" and not "incidental advantages that might possibly result from the legislation of congress upon other subjects connected with commerce ...." *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 435, 15 L.Ed. 435 (1856) (emphasis added); *accord Alabama Great Southern R.R. v. United States*, 340 U.S. 216, 229, 71 S.Ct. 264, 272, 95 L.Ed. 225 (1951) (quoting *Louisiana Public Service Commission v. Texas & N.O.R.R.*, 284 U.S. 125, 131, 52 S.Ct. 74, 76, 76 L.Ed. 201 (1931)); *Armour Packing Co. v. United States*, 209 U.S. 56, 80, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908). Although such indirect advantages may result from natural differences between ports, no requirement exists that the varying impact of legislation on ports be capable of justification with reference to such natural differences or any rational classification of ports.

■ The cited authorities also hold that the clause prohibits discrimination between states and not between ports. In other words, legislation intended to benefit all ports of one state at the expense of all ports of another is the evil at which the clause is directed. It does not prevent Congress from granting a preference to one port over another or to some ports over others—for example, by designating some ports as ports of entry. Even assuming that the advantage enjoyed by ports on exempt waterways is a preference within the meaning of the clause, the preference has been conferred on those ports without regard to their location within particular states, as is clear from the fact that states in which some ports are on taxed waterways and some are on exempt form the largest category. Finally, no suggestion is present that Congress deliberately intended to grant a prohibited preference to any state.

*The Tax Uniformity Clause*

■ Plaintiffs argue that the alleged arbitrary selection of the 26 covered waterways also brings the Act into conflict with the Tax Uniformity clause, which requires that a tax operate "with the same force

and effect in every place where the subject of it is found," *Head Money Cases (Edye v. Robertson)*, 112 U.S. 580, 594, 5 S.Ct. 247, 251, 28 L.Ed. 798 (1884), and that "whatever plan or method Congress adopts for laying the tax in question, the same plan and the same method must be made operative throughout the United States; ..." *Knowlton v. Moore*, 178 U.S. 41, 84, 20 S.Ct. 747, 764, 44 L.Ed. 969 (1900). As plaintiffs acknowledge, however, as long as these requirements are met, disparate impacts of the tax on different parts of the country caused, for example, by the presence of the subject of the tax in varying amounts from state to state, do not vitiate uniformity in the constitutional sense. *Id.* at 104, 20 S.Ct. at 772; *Florida v. Mellon*, 273 U.S. 12, 17, 47 S.Ct. 265, 266, 71 L.Ed. 511 (1927).

As summarized above, according to plaintiffs, the "subject" of the tax in this case is waterways "having a draft of fourteen feet or less, used for commercial shallow draft vessels, and involving substantial and recurring Federal expenditures for the improvement of navigation." H.R.Rep. No. 95–545, 95th Cong., 1st Sess. 19 (1977); *accord* 124 Cong.Rec. 35,342 (1978) (remarks of Sen. Long, sponsor of amendment passed by the Senate). Because many waterways answering to those criteria are not listed in the Act and no other "legitimate scheme of classification" according to which the waterways were selected is apparent, plaintiffs charge that Congress has established an arbitrary, non-uniform classification of waterways "that depends upon the location, not the nature, of a particular waterway." Plfs' Br. filed Feb. 18, 1983, at 17, 21.

■ 1. The constitutional restrictions applicable to taxes, including the Tax Uniformity clause, do not apply to the Inland Waterways Revenue Act, however. The Supreme Court has "consistently recognized that the interests protected by these Clauses are not offended by revenue measures that operate only to compensate a government for benefits supplied." *Massachusetts v. United States*, 435 U.S. 444,

462, 98 S.Ct. 1153, 1164, 55 L.Ed.2d 403 (1978). In rejecting a constitutional challenge to a federal aircraft registration tax based on the states' constitutionally implied immunity to federal taxation, the Court in *Massachusetts* relied on "[a] clearly analogous line of decisions ... interpreting provisions in the Constitution that also place limitations on the taxing power of government." *Id.* at 462, 98 S.Ct. at 1164: *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977) (state tax "fairly related to the services provided by the state" on privilege of doing business within it upheld against Commerce Clause challenge); *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972) (state head tax on air passengers to support airport facilities upheld against Commerce clause challenge); *Clyde Mallory Lines v. Alabama ex rel. State Docks Commission,* 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215 (1935) (harbor fees to defray costs of policing upheld against challenge under Commerce clause and art. 1, § 10, cl. 3 prohibition against duties of tonnage); *Packet Co. v. Keokuk,* 95 U.S. 80, 84, 5 Otto 80, 84, 24 L.Ed. 377 (1877) (wharfage fees upheld against duty of tonnage prohibition; "[A] charge for services rendered or for conveniences provided is in no sense a tax or a duty.").

■ The same rule applies to defeat a challenge under the Tax Uniformity clause. *Head Money Cases (Edye v. Robertson),* 112 U.S. at 595–96, 5 S.Ct. at 252–53 (rejecting Tax Uniformity clause challenge to passenger head tax imposed on shipowners to defray cost of regulating immigration and of temporary care of immigrants in distress) (citing *Packet Co. v. Keokuk,* 95 U.S. 80, 5 Otto 80). Plaintiffs' effort to distinguish the *Head Money Cases* on the grounds that the Act is not a regulatory statute with incidental revenue features like that involved in the *Head Money Cases* and that the shipowners there were required to contribute to the cost of mitigating an evil they had created (the presence on our shores of destitute immigrants),

while plaintiffs here are required to pay for facilities they use, is unpersuasive. A user charge is one type of revenue measure designed to compensate the Government for supplying a benefit to the user and, as such, is not subject to the constitutional limitations on the Government's power to tax, including the Tax Uniformity clause.

Plaintiffs argue that the waterways fuel tax is not a valid user charge because Congress might have chosen a levy "more closely tied to use of the waterways or the value of navigational improvements to the users," Plfs' Br. filed Mar. 23, 1984, at 8, whereas under the method chosen "[t]here is simply not the necessary relationship between the enforced contribution of those liable for the tax and any particular value to them of the federal navigational improvements to which they must contribute." *Id.* at 7. Therefore, plaintiffs argue, Congress "did not purport to be setting a fee." *Id.* at 8.

In the analogous state highway toll cases, however, the Supreme Court has sustained "numerous tolls based on a variety of measures of actual use, including: horsepower, ... number and capacity of vehicles, ... mileage within the State, ... gross-ton mileage, ... carrying capacity, ... and manufacturer's rated capacity and weight of trailers ...." *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.,* 405 U.S. at 715, 92 S.Ct. at 1354 (citations omitted). Recognizing that "[c]omplete fairness would require that a state tax formula vary with every factor affecting appropriate compensation for road use," *Capitol Greyhound Lines v. Brice,* 339 U.S. 542, 546, 70 S.Ct. 806, 808, 94 L.Ed. 1053 (1950), resulting in problems of administration, the Court has held that a highway tax must be judged "by its result, not its formula," *id.* at 545, 70 S.Ct. at 808, and must be sustained "unless the amount is shown to be in excess of fair compensation for the privilege of using state roads." *Id.* at 547, 70 S.Ct. at 809. Plaintiffs have made no such allegation.

**168**

Moreover, the legislative history of the Act, relied on by both parties, reveals that Congress considered the fuel tax to be one of several possible methods of charging for waterway use, and not a tax on the consumption of a commodity—the conventional category of excise tax—as plaintiffs argue. Congress considered a number of alternatives to a fuel tax, all designed to reflect actual use, including segment-by-segment tolls based on cargo value (vehemently opposed by the barging industry, *see Waterway User Charges: Hearings on H.R. 8309 Before the Subcomm. on Water Resources of the House Comm. on Public Works and Transportation*, 95th Cong., 1st Sess. 43 (1977) (testimony of John A. Creedy, President, Water Transport Association) [hereinafter cited as "Public Works Hearings"]), lockage fees, and ton-mile segment charges. *Id.* at 63 (testimony of Rep. Edgar, sponsor of a House bill imposing user fees).

■■■ Congress' choice of method for devising a charge to reflect waterway use is not subject to attack on the ground that some other method would better reflect actual use. *Capitol Greyhound Lines v. Brice*, 339 U.S. 542, 70 S.Ct. 806. The legislative history shows that Congress' choice was rationally based. A system-wide fuel tax was said to be "a fair method of distribution," Public Works Hearings at 77 (testimony of Brock Adams, Secretary of Transportation), despite concern about the possible unfairness of the cross-subsidization of waterways that would result, whereas a segment toll could cause some waterways to shut down, wasting large federal investments. H.R.Rep. No. 95–545, 95th Cong., 1st Sess. 33 (statement of Rep. Bonior). The Committee on Public Works and Transportation recommended a fuel tax because it was "relatively easy to administer in comparison with alternative mechanisms ... and its imposition *establishes the principle of applying the user charge concept....*" *Id.* at 41 (emphasis added).

The tax is repeatedly referred to as a "user charge" or "user tax" in the legislative history, *see, e.g., User Taxes for the Inland Waterways of the United States: Hearings on H.R. 8309 Before the House Comm. on Ways and Means*, 95th Cong., 1st Sess. 2 (1977) (remarks of Rep. Ullman, chairman) [hereinafter cited as "Ways and Means Hearings"]; 124 Cong.Rec. 35,346 (1978) (remarks of Sen. Stevenson, co-sponsor),[4] and the goals of recovering maintenance and construction costs and of achieving intermodal equity by forcing waterway transport to pay its way like other modes of transport received repeated emphasis. *See, e.g.,* Public Works Hearings at 61 (remarks of Rep. Oberstor); Ways and Means Hearings at 3 (testimony of Secretary Adams). *See generally* T. Reid, *Congressional Odyssey—the Saga of a Senate Bill*, 1–7, 128 & *passim* (1980).[5] The fact that

---

**4.** Laurence N. Woodworth, Assistant Secretary of the Treasury for Tax Policy, in discussing the "narrow line that must be drawn between what constitutes revenue legislation and what constitutes fees," Ways and Means Hearings at 48, explained, "What we are really talking about are taxes in the nature of user charges ...." a description he devised due to the disparity between the minor four-cent per gallon fuel charge proposed and the cost of the federal waterway program. *Id.* at 49. Secretary Adams categorically labelled the fuel tax a user fee because "an identifiable benefit is received by the person who pays the charge. A general tax or revenue-raising measure does not necessarily have that distinction." *Id.* at 21. Senator Proxmire complained that the final Senate bill provided for a user fee "but a user fee that is much too small to cover the cost .... Nevertheless, it is a step in the right direction. For the first time we shall have a user fee on the waterways." 124 Cong.Rec. 35,343 (1978).

**5.** Plaintiffs cited this anecdotal chronicle of the extraordinary, serpentine history of the Act. *See also Legislative Background of the Waterway User Charges Legislation During the 95th Congress*, 95th Cong., 2d Sess. 532–62, 593–97, 641–50 (1978) (Comm. Print 1978) (reprinting series of articles by T. Reid entitled *Saga of a Senate Bill—Battle Lines Drawn Over Waterway Fees*) [hereinafter cited as "Comm. Print"].

According to the Reid book, Sen. Pete Domenici introduced S. 790, 95th Cong., 1st Sess. (1977), an initially obscure bill apparently no different from the many preceding failed attempts since the Roosevelt administration to apply an inland waterway charge. (*See* Public Works Hearings at 86 for discussion of the historic justification for not charging waterway

monies collected are placed in a trust fund intended to be used for waterway maintenance and construction further suggests a congressional purpose to recoup part of the cost of facilities provided by the Government.[6]

■ 2. The selection of the 26 waterways does appear to be based on a legitimate, rational classification of waterways. The original purpose of listing the covered waterways, rather than defining their characteristics, evidently was to avoid uncertainty. The barge industry favored this approach. *See* Public Works Hearings at 32 (testimony of Ron Schrader, Executive Director, National Comm. on Locks and Dam 26). In upholding Congress' exemption of certain Alaskan crude oil from the Crude Oil Windfall Profit Tax Act against a Tax Uniformity challenge, the Supreme Court recently counseled:

> Where Congress defines the subject of a tax in nongeographic terms, the Uniformity Clause is satisfied.... We cannot say that when Congress uses geographic terms to identify the same subject, the classification is invalidated. The Uniformity Clause gives Congress wide latitude in deciding what to tax and does not prohibit it from considering geo-graphically isolated problems.... But where Congress does choose to frame a tax in geographic terms, we will examine the classification closely to see if there is actual geographic discrimination.

*United States v. Ptasynski*, 462 U.S. 74, 103 S.Ct. 2239, 2245, 76 L.Ed.2d 427 (1983) (citations omitted).

In conducting the close examination required in this case, the court has followed the guidance of the Second Circuit regarding scrutiny of a tax statute challenged under the Equal Protection clause: "The rational basis [for classification] need not be stated in the statute or its legislative history; ..." Instead, the court may " 'try to divine what Congress left unstated [and] [sic] ... resort to ... [its] own talents and those of counsel to discern' the rationality of the classification in question." *Burke Mountain Academy, Inc. v. United States*, 715 F.2d 779, 783 (2d Cir.1983) (quoting *First National Bank of Oregon v. United States*, 215 Ct.Cl. 609, 616, 571 F.2d 21, 25, *cert. denied*, 439 U.S. 827, 99 S.Ct. 100, 58 L.Ed.2d 120 (1978) [quoting *Bruinooge v. United States*, 213 Ct.Cl. 26, 31, 550 F.2d 624, 627 (1977) ] ); *cf. United States v. Tobin*, 195 F.Supp. at 607 (applying equal protection "reasonable classification" anal-

---

user fees.) The Domenici bill linked a major lock and dam construction project with a user charge designed to achieve complete recovery over ten years of federal operation and maintenance costs on waterways and recovery of half of new construction costs. Tolls and license fees were to be published annually by the Executive branch based on expected federal expenditures. At one point Senator Domenici's legislation covered over 90 waterways under the definition of "inland waterways of the United States." Comm. Print at 379–81. Reid writes that Domenici obtained the Carter administration's commitment to the linkage and, in particular, a threatened veto of any bill that failed to ensure capital recovery.

Upon securing Senate passage, the bill ran aground in the House because U.S. Const. art. I, § 7, cl. 1 provides that revenue bills must originate in the House. There it emerged as a new bill, H.R. 8309, 95th Cong., 1st Sess. (1977), imposing a flat rate diesel-fuel tax which, in its final form became a six-cent fuel tax. The House bill then returned to the Senate.

A compromise was developed between old S. 790 and H.R. 8309 featuring an ascending fuel tax (from four to 12 cents) coupled with a separate fee system to recover a fixed percentage of federal waterway expenditures. This bill was defeated, although the four-to-12-cent user fee survived in an amendment finally passed by the Senate. When President Carter stated that he would veto such a proposal, the Senate devised the trust fund to satisfy the administration's insistence on capital recovery, in addition to a flat ten-cent fuel tax. H.R. 8533, 95th Cong., 2d Sess. (1978), which immunized tax-exempt organizations from paying taxes on profits from bingo games, was the host for the final House waterways bill, which passed with the trust fund and the ascending four-to-ten-cent user fee.

6. Plaintiffs also argue unpersuasively that the tax is classified in subtitle D of the Internal Revenue Code, 26 U.S.C., among "Miscellaneous Excise Taxes" and that before 1964 section 164(c) of the Code included state gasoline taxes among deductible state sales taxes, although they were user taxes. The nature of the tax, not its classification for codification or other purposes, is controlling.

ysis in context of Port Preference clause challenge). In offering its own justification for the selection of the waterways,[7] the court is indebted to an impressive compendium of data diligently assembled and supplied by plaintiffs' counsel.

Twenty two of the 25 covered waterways for which spending data were available[8] had absorbed more federal funds[9] by 1977 (the year before passage of the Act) than any of plaintiffs' 50 (except the Tombigbee-Tennessee and Okeechobee Waterways, still under construction, and the Sacramento River, most of whose commerce is ocean-going).[10] Only eleven of plaintiffs' otherwise qualified waterways[11] for which documentation relating to funding was supplied[12] had outspent any of the 26. In other words, even the cheapest taxed waterway outspent all but eleven of plaintiffs' waterways. The expenditure levels of the eleven overlap with those of three of the 26 (the Willamette, Pearl, and White Rivers).[13] In the eyes of Congress, only the eleven may have met the criterion of "involving substantial and recurring federal expenditures."

Secondly, there is much to suggest that the importance of a given waterway was among the criteria governing selection. John A. Creedy, President of the Water Transportation Association, a spokesman for the barge industry, testified in the Public Works Hearings that a substantially identical list of waterways "appear[s] accurately to define the shallow-draft facilities

---

**7.** Plaintiffs' analysis of the 50 exempt waterways was tabulated in their Statement of Genuine Facts as to Which There Is No Genuine Issue. Each of the 50 was said to have a depth of 14 feet or less and to benefit from substantial and recurring federal expenditures. Plaintiffs listed for every waterway length in miles, project depth in feet, year of data, federal expenditures for navigation, commerce tonnage in short tons, and primary commodities. Although defendant did not submit a factual counterstatement or otherwise take issue with the particulars of plaintiffs' analysis, the Government offered a tabulation of the ton-miles of traffic on both the 26 covered waterways and plaintiffs' list of 50 exempt waterways showing that the covered waterways from 1966–77 carried between 99.5 and 99.7 per cent of the ton-mile traffic on all 76. "In sum, it appears that Congress did indeed capture the major components of the inland waterway system used for commercial shallow-draft barging for purposes of the initial imposition of a waterway user tax." Def's Br. filed Oct. 31, 1983, at 25.

Because the court is required to make an examination of the evidence considered by Congress, the court has reviewed the one consultant and several agency reports submitted by defendant, the Act's complete legislative history, the data upon which plaintiffs based their analysis of the 50 exempt waterways, and similar data for the 26 taxed waterways. In addition, due note has been taken of plaintiffs' supplements to their Statement of Genuine Facts, whereby plaintiffs annotated their table of exempt waterways and supplied an annotated table for the 26 taxed waterways corresponding to that submitted for the 50 exempt.

**8.** No spending data were available for the taxed part of the Atchafalaya River.

**9.** The amount of federal funds spent by September 1977 on the 22 for new work, operation, maintenance, and rehabilitation ranged from $29,890,952 (Green and Barren Rivers) to $3,241,665,104 (lower Mississippi River—construction and maintenance only).

**10.** Spending data derive from U.S. Army Corps of Engineers, Chief of Engineers on Civil Works Activities, *Annual Report FY 1977.* Congress intended for the time being to exclude waterways carrying primarily ocean-going traffic, apparently because of the admixture of international traffic on such waterways and difficulties in monitoring fuel used thereon. *See, e.g.,* Public Works Hearings at 79 (testimony of Secretary Adams); Ways and Means Hearings at 75 (remarks of Rep. Edgar summarizing Secretary Adams' testimony). The Caloosahatchee to Anclote River Waterway also falls into this category (as may the Okeechobee Waterway).

**11.** The Sacramento River and the Caloosahatchee-Anclote River Waterway (which primarily carry ocean-going commerce), the Okeechobee and Tombigbee-Tennessee Waterways (which are uncompleted), and the Overton-Red River Waterway (an alternate channel of the Red River) should not be counted.

**12.** None was available for the Trinity and Kalamazoo Rivers. (In any event, the latter is a flood control, not a navigation, project.)

**13.** The eleven are, in order of expenditure, the Fox, and Savannah Rivers, New Jersey Intracoastal Waterway, Willapa and Naselle Rivers (taken as one), Mermentau, and Grand Rivers, Freshwater Bayou, Cape Fear, Siuslaw, and Rogue Harbor Rivers, and Barataria Bay Waterway.

of the inland river and canal system used for commercial barging," Public Works Hearings at 43,[14] and the Report of the House Committee on Public Works and Transportation states that, although the committee attempted to include all waterways meeting the criteria, "Some small segments such as bayous and short interconnecting waters may have been excluded...." H.R.Rep. No. 95–545, 95th Cong., 1st Sess. 19. Several of the eleven are short or may be characterized as interconnecting waterways [15], for example, the Barataria Bay Waterway (connecting the Gulf Intracoastal Waterway and the Gulf of Mexico) and the Mermentau River (consisting of several interconnecting channels totalling 26.67 miles in length).

Finally, the vastly greater volume of commerce carried by the 26 covered waterways as compared to the 50 exempt is suggestive. In 1977 the 26 bore 99.7 percent (between 3,767,750 (Pearl River) and 73,277,161,533 ton-miles (Lower Mississippi) of internal traffic) of the combined traffic of plaintiffs' and the listed waterways.[16] Only four of plaintiffs' eleven high-cost waterways (including the Mermentau River and Barataria Bay waterway) bore as much traffic as the Pearl River.[17] Congress may have thought it not worth the trouble to monitor fuel use on less active rivers.

The only real anomaly that emerges from the data supplied by plaintiffs is the fact that the exempt Savannah River spends more money ($15,188,643 by 1977), bears more commerce (15,975,841 ton-miles in 1977), and has a longer project length (181 miles) than the non-exempt Pearl River ($12,554,991 by 1977; 3,767,750 ton-miles

in 1977; 58 miles), yet is not taxed. It may also be considered anomalous that the exempt Cape Fear River absorbs more funds ($11,596,789 by 1977) than the non-exempt White River ($5,858,462 by 1977), the cheapest of the 26, and has more traffic (16,492,535 ton-miles in 1977) than the non-exempt Pearl River (the least used of the 26) and has a longer shallow-draft project length (111 miles) than the Pearl, yet is not taxed. The Savannah and Cape Fear may be distinguishable on the ground that they flow into the Atlantic Ocean, whereas the Pearl and White are tributaries of the Mississippi and thus part of a larger network.

In *United States v. Ptasynski*, 103 S.Ct. 2239, the Supreme Court refused to substitute its judgment for that of Congress with respect to tax legislation favoring certain Alaskan oil where Congress' decision that the oil required separate treatment was based on "neutral factors" and the Court found no indication "that Congress *intended* to grant Alaska an undue preference at the expense of other oil-producing States," *id.* at 2246 (emphasis added), or that it "sought to benefit Alaska for reasons that would offend the purpose of the [Tax Uniformity] Clause," *id.*,—to guard against deliberate combinations of states in Congress to secure improper advantages to themselves at the expense of other states. *See id.* at 2243. The court is satisfied that the selection of the 26 waterways was not the result of any such combination. Although the process whereby Congress identified each of the covered waterways is not displayed in the legislative materials,[18] the factors that Congress considered were neutral and had a rational relationship to the

14. The list referred to was contained in H.R. 8309, 95th Cong., 1st Sess. § 103 (1977). *See* Public Works Hearings at viii-xi.

15. Only the "project length"—the part maintained by the Army Corps of Engineers—not the total length of a river from its source, is considered.

16. Commerce data derive from Department of the Army Corps of Engineers, *Waterbourne Commerce of the United States,* Calendar Year 1977, Part 2.

17. No traffic data were available on the Fox River. Ton-mileage, rather than tonnage, is chosen as the appropriate unit for measuring traffic because of its closer relationship to fuel use.

18. The designation of 26 inland and intracoastal waterways for taxing purposes was very carefully considered by the Public Works Committee on consultation with the ... [Army Corps of Engineers] and other outside organizations. 123 Cong.Rec. 33,187 (1977) (remarks of Rep. Frenzel).

purpose of the Act. "Where ... Congress has exercised its considered judgment with respect to an enormously complex problem, we are reluctant to disturb its determination." *Id.* at 2246.

## CONCLUSION

Based on the foregoing, defendant's cross-motion for summary judgment is granted, and plaintiffs' is denied. The Clerk of the Court will enter judgment for defendant and dismiss the amended complaint.

IT IS SO ORDERED.