Filed 11/20/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| FRANCHISE TAX BOARD, | |
|      Petitioner, | |
| v. | A134734 |
| THE SUPERIOR COURT OF SAN FRANCISCO COUNTY, | (San Francisco County |
|      Respondent; | Super. Ct. No. CG-C010-501299) |
| QUELLOS GROUP, LLC, | |
|      Real Party in Interest. | |
| | |
| FRANCHISE TAX BOARD, | |
|      Petitioner, | |
| v. | A134735 |
| THE SUPERIOR COURT OF SAN FRANCISCO COUNTY, | (San Francisco County |
|      Respondent; | Super. Ct. No. CGC-09-487540) |
| QUELLOS FINANCIAL ADVISORS, LLC, | |
|      Real Party in Interest. | |

The Franchise Tax Board (FTB or the Board) sought penalties against real parties in interest Quellos Group, LLC and Quellos Financial Advisors, LLC (collectively Quellos) for allegedly promoting an abusive tax shelter to a California taxpayer in 2001. Respondent Superior Court of San Francisco ruled for Quellos, and the Board seeks

1

review of a single issue: whether a 2003 amendment to Revenue and Taxation Code[1] section 19177 increasing the penalty for promoting an abusive tax shelter from $1,000 to 50 percent of the gross income received can be retroactively applied. The financial consequences of the answer are enormous: if the statute is not retroactive, the two promoters here have to write a check for only $2,000, but if the statute is retroactive, the promoters must write a check for almost $27 million, plus a dozen years of interest.

Respondent court concluded that the statute cannot be retroactively applied, and the Board must be satisfied with the $2,000. We reach the same conclusion, relying in large part on an uncodified provision enacted with the 2003 amendments to section 19177, in which the Legislature directed that "this act shall apply with respect to any penalty assessed on or after January 1, 2004, *on any return for which the statute of limitations on assessment has not expired*. All other provisions of this act shall apply on or after January 1, 2004." (Italics added.) The FTB acknowledges that the penalty imposed by any version of section 19177 is not a penalty "assessed . . . on [a] return." And what we conclude is dispositive is other language in the uncodified provision, which establishes that the Legislature did address the issue of retroactive sanctions in a variety of contexts, including for promoters, but only authorized retroactive application of a penalty in the case of a specific type of inaction by them. Because the issue of retroactive application was expressly addressed by the Legislature, we cannot expand that application as the Board requests, and we thus deny its petitions for mandate.

## BACKGROUND

### The Setting And The Statutes

A knowledgeable observer of abusive tax shelters, recognizing that they represent one of the most fertile fields for financially-driven creativity, likens them to pornography in that they "may be easier to recognize than define." (Bankman, *The New Market in Corporate Tax Shelters* (June 21, 1999) Tax Notes 1775, 1777.) They are also very much

---

[1] Statutory references are to the Revenue and Taxation Code unless otherwise indicated.

2

a moving target in that one of their typical characteristics is that "the shelter is likely to be shut down by legislative or administrative change soon after it is detected." (*Id*. at pp. 1777, 1781) Like performance-enhancing drugs in sport, it appears impossible for taxing authorities to anticipate what the latest generations of shelters will look like until they actually appear.

California's primary weapon in the fight against bogus shelters has always been section 19177. The state was following the lead of the federal government, which first legislated on the subject in 1982. When originally enacted, section 6700 of the Internal Revenue Code (26 U.S.C. § 6700) directed that promoters of abusive tax shelters "shall pay a penalty equal to the greater of $1,000 or 10 percent of the gross income derived or to be derived by such person from such activity." (Pub.L. No. 97-248, § 320(a) (Sept. 3, 1982) 96 Stat. 611.)[2] In 1993, California followed with the first version of section 19177, which provided simply: "A penalty shall be imposed for promoting abusive tax shelters. The penalty shall be determined in accordance with provisions of Section 6700 of the Internal Revenue Code." (Stats. 1993, ch. 31, § 26.)

A decade later, California resolved to address the issue in a more systematic fashion.[3] In 2003, as part of a multi-faceted approach to halting (or at least slowing) the

---

[2] In 1984, Congress increased the penalty to $1,000 or 20 percent (Pub.L. No. 98-369, § 143(a) (July 18, 1984) 98 Stat. 682), and five years later upped it to $1,000 or 100 percent. (Pub.L. No. 101-239, § 7734 (Dec. 19, 1989) 103 Stat. 2403.) In 2004, the penalty dropped to $1,000 or 50 percent. (Pub.L. No. 108-357, § 818(a) (Oct. 22, 2004), 118 Stat. 1584.)

[3] For example, in section 19177 the Legislature was using the term "abusive tax shelter," but providing no definition of the term. Not until 2003 was that omission remedied, albeit in a peculiar fashion. The Legislature statutorily described an "abusive tax shelter" in several ways, one of which was "Any entity, investment plan or arrangement, or other plan or arrangement which is of a type that the Secretary of the Treasury or the Franchise Tax Board determines by regulations as having as potential for tax avoidance or evasion." (Former § 19777, subs. (b)(2), added by Stats. 2003, ch. 654, § 13; Stats. 2003, ch. 656, § 13; see also former § 19164, subd. (g), amended by Stats. 2003, ch. 654, § 6; Stats. 2003, ch. 656, § 6 ["the term 'tax shelter' means (1) a partnership or other entity, (2) any investment plan or arrangement, or (3) any other plan or arrangement, if a significant purpose of the partnership, entity, plan, or arrangement is

the avoidance or evasion of federal income tax or the tax imposed under Part 10 (commencing with Section 17001)," i.e., California's Personal Income Tax Law].) Although not formally part of the statutory definition of what is now called an "abusive tax avoidance transaction" (§ 19777, subd. (a), amended by Stats. 2011, ch. 14, § 24), the concept of the abusive tax shelter was elsewhere described as "any transaction of a type . . . having a potential for tax avoidance or evasion, including deductions, basis, credits, entity classification, dividend elimination, or omission of income." (§ 18407, subd. (a)(3).) However, because the term "abusive tax shelter" was retained in all the versions of section 19177, and because it is more widely employed in everyday usage, it will continue to be used here.

Another peculiarity of the Legislature's output on abusive tax shelters is that while section 19177 penalizes "promoting abusive tax shelters," the concept of "promoting" or the identity of the person or entity doing the "promoting" is nowhere statutorily defined. It used to be, generally following the language of a prior version of 26 U.S.C. § 6700. (See former § 18648, subd. (c), added by Stats. 1993, ch. 31, § 26, pp. 175-176 [promoter is one who organizes or participates in the sale of "any entity, any investment plan or arrangement . . . which generates a loss for any investor in excess of his or her cash investment," or who in connection with such a scheme makes or furnishes "A statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit"].) But the Legislature dropped this definition in the 2003 enactments, replacing the single concept of "promoter" with the new terms "organizer," "seller," and "material advisor," all "mean[ing] a person that meets any of the requirements of this section or of Section 6112 of the Internal Revenue Code." (§ 18648, subd. (e), amended by Stats. 2003, ch. 654, § 4; Stats. 2003, ch. 656, § 4.) But the version of 26 U.S.C. § 6112 in effect at the time dealt only with organizers and sellers (Pub.L. No. 98-369, § 142(a) (July 18, 1984), 98 Stat. 6812), and now only addresses material advisors, adopting the definition in 26 U.S.C. § 6111. Section 18648 kept up with this last change, and now discusses only material advisors, that is, a person or entity that "[p]rovide[s] any material aid, assistance, or advice with respect to organizing, managing, promoting, selling, or implementing, insuring, or carrying out any reportable transaction with respect to a taxpayer that meets any of the following conditions: [¶] (A) Is organized in this state. [¶] (B) Does business in this state. [¶] (C) Derives income from sources in this state." (§ 18648, subd. (c)(4); Stats. 2005, ch. 691, § 43.5.) It thus appears that while section 19177 still penalizes "promoting abusive tax shelters," its current target is "material advisors" involved with an "abusive tax avoidance transactions" (e.g., §§ 19751, subd. (b), 19753, subd. (c), 19755, subd. (a)(1), 19763, subds. (a)(1), (c); see also Bus. & Prof. Code, § 5050, subd. (b)), which is now defined largely by reference to federal law. (See § 19777, subd. (b) ["abusive tax avoidance transaction means any of" specified Internal Revenue Code provisions, plus § 19774, which incorporates additional federal provisions]; see also § 19753, subd. (c) ["an 'abusive tax avoidance transaction' means a plan or arrangement

4

hemorrhaging of state revenues caused by abusive tax shelters (see fn. 10, *post*), section 19177 was amended to read:

"(a) A penalty shall be imposed for promoting abusive tax shelters. The penalty shall be determined in accordance with the provisions of Section 6700 of the Internal Revenue Code, except as otherwise provided.

"(b) Notwithstanding Section 6700(a) of the Internal Revenue Code, if an activity with respect to which a penalty imposed under Section 6700(a) of the Internal Revenue Code involves a statement described in Section 6700(a)(2)(A) of the Internal Revenue Code,[4] the amount of the penalty imposed under subdivision (a) shall be equal to 50 percent of the gross income derived (or to be derived) from that activity by the person on which the penalty is imposed." (Stats. 2003, ch. 654, § 9; Stats. 2003, ch. 656, § 9.)[5]

---

designed for the principal purpose of avoiding tax. Abusive tax avoidance transactions include, but are not limited to, 'listed transactions' as described in paragraph (4) of subdivision (a) of Section 18407."].)

[4] The incorporated federal subdivision at the time provided: "(a) Any person who [¶] . . . [¶] (2) makes or furnishes or causes another person to make or furnish . . . . [¶] (A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter . . . [¶] . . . shall pay, with respect to each activity described in paragraph (1), a penalty equal to the $1,000 or . . . 100 percent of the gross income derived (or to be derived), by such person from such activity. For purposes of the preceding sentence, activities described in paragraph (1)(A) [dealing with organizing or assisting in organizing "a partnership or other entity," "any investment plan or arrangement," or "any other plan or arrangement"] shall be treated as a separate activity and participation in each sale described in paragraph (1)(B) [dealing with participating "(directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A)"] shall be so treated." (26 U.S.C. § 6700, subd. (a)(2)(A), as amended by Pub.L. No 101-239 § 7734(a) (Dec. 19, 1989) 103 Stat. 2403.)

[5] Two bills, Assembly Bill 1601 and Senate Bill 614, were passed in the same legislative session. They are virtually identical—the only differences are the bill numbers, the authors, and that the Legislative Counsel gave the subject of Chapter 654 as "Administration of taxes: tax shelters: penalties," while the subject of Chapter 656 was simply "Tax shelters." (Legis. Counsel's Dig., Assem. Bill 1601 & Sen. Bill 614

An uncodified section in the 2003 enactments provided in pertinent part: "(a) Unless otherwise provided, this act shall apply with respect to any penalty assessed on or after January 1, 2004, on any return for which the statute of limitations on assessment has not expired. All other provisions of this act shall apply on or after January 1, 2004." (Stats. 2003, ch. 654, § 15; Stats. 2003, ch. 656, § 15, subd. (a).)[6] We shall refer to this language as "section 15(a)" and the entirety of the uncodified provision as "section 15."

### The Proceedings Below

Pursuant to this language, and the 2003 version of section 19177, the FTB assessed Quellos $26,954,965 in penalties, this being 50 percent of the $53,909,930 Quellos allegedly received for promoting an abusive tax shelter to a California taxpayer in 2001. In accordance with section 19180, Quellos paid 15 percent of the assessment ($4,043,244.25) to the FTB and then, when their administrative requests were denied, filed separate actions in respondent court for refund. The FTB responded with cross-complaints for the unpaid 85 percent of the assessed penalties.[7] After the two

---

(2003-2004 Reg. Sess.) Stats. 2003, Summary Dig., pp. 320, 321.) Each measure specified that it would become operative only if the other measure was chaptered. (Stats. 2003, ch. 654, § 17; Stats. 2003, ch. 656, § 17.) Both bills were chaptered on the same day, October 2, 2003, and, as will be shown, both became operative on January 1, 2004. We shall refer to the two bills as "the 2003 enactments."

An excellent description of all facets of the measures is Coffill, *An Overview of California's 2003 Tax Shelter and Abusive Tax Shelter Legislation* (Jan.-Feb. 2004) 56 Tax Executive 33.

[6] In 2005, the Legislature largely returned section 19177 to its original language so that it currently provides: "A penalty shall be imposed for promoting abusive tax shelters and shall be determined in accordance with Section 6700 of the Internal Revenue Code, except as otherwise provided." (Stats 2005, ch. 691, § 47.5.) The federal statute is thus incorporated by reference in its current form. (§ 9.)

[7] Beyond identifying it as "a tax-advantaged transaction called the 'Portfolio Optimization Investment Transaction' " (POINT), neither of Quellos' refund complaints provided any details of what the FTB found objectionable. However, the FTB alleged in its cross-complaints that in 2001 a "California taxpayer . . . decided to sell his interest in Fox Worldwide, Inc. . . . to Disney at a profit of approximately $1.5 billion dollars." The

6

actions were joined, the parties agreed to a bifurcation whereby they agreed to submit to respondent court the issue of whether the 2003 version of section 19177 applied to Quellos' 2001 transactions.

After hearing argument, and considering the voluminous papers and requests for judicial notice of the legislative history for the 2003 enactments, respondent court filed a tightly-reasoned 16-page statement of decision largely accepting Quellos' view of the matter. The court's conclusion was that "No iteration of Section 19177 supports the imposition of the fifty percent penalty on Quellos' 2001 alleged promotional activities. Instead, the maximum penalty allowed against each is $1,000. The Quellos are each entitled to a refund from the FTB of the amount paid in excess of that maximum."[8]

---

taxpayer's "tax lawyer, Matthew Krane, and Quellos [Group] principal Charles Wilk presented a tax plan [to the taxpayer] to create a full tax deferral of the Disney sale. The plan was organized by . . . Quellos Group, which includes its wholly owned subsidiary, Quellos Custom Strategies, LLC." Quellos "designed the POINT transaction . . . to eliminate the reporting of a $1.5 billion capital gain." Quellos denied these allegations.

The Internal Revenue Service website lists this specific POINT scheme among "Examples of Abusive Tax Schemes—Fiscal Year 2011." It also reports that attorney Krane, Quellos principal Wilk, and a Quellos officer pleaded guilty to federal charges of tax evasion, and "paid $7 million in penalties to the IRS." No blame was attached to the taxpayer. (Available online at <http://www.irs.gov/uac/Examples-of-Abusive-Tax-Schemes-Fiscal-Year-2011> [as of 11/20/2013].)

[8] In light of this determination, respondent court did not deem it necessary to reach the issue of whether retroactive application of the increased *penalty* in the 2003 version of section 19177 would violate the Due Process Clause of the United States and California constitutions, notwithstanding the generally conceded legislative power to retroactively increase *taxation* rates. (See, e.g., *National Federation of Independent Business v. Sibelius* (2012) __U.S. __ [132 S.Ct. 2566, 2597, 2600] ["In distinguishing penalties from taxes, this Court has explained that 'if the concept of penalty means anything, it means punishment for an unlawful act or omission' "; "Congress's ability to use its taxing power to influence conduct is not without limits. . . . ' "there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment" ' "]; *United States v. Carlton* (1994) 512 U.S. 26, 30-33 ["Tax legislation is not a promise, and a taxpayer has no vested interest in the Internal Revenue Code"; Congress did not act arbitrarily or irrationally in changing gift tax rule with "a modest period of retroactivity"]; *Milliken v. United States* (1931) 283 U.S. 15 [upholding

The FTB then commenced these original proceedings, filing a petition for each of the actions against the separate Quellos entities, seeking a writ of mandate "directing respondent superior court to set aside and vacate its Statement of Decision and enter a Statement of Decision holding that the 2003 amendments to section 19177 apply to all promoter penalty assessments issued on or after January 1, 2004, including those assessments that penalize promoter activities that occurred prior to January 1, 2004." After issuing an order to show cause and receiving Quellos' return, we ordered the two proceedings consolidated for purposes of argument and decision.

## REVIEW

### The Propriety of Review by Extraordinary Writ Petition

Respondent court's written decision was in effect a ruling on an issue of law in a bifurcated trial, akin to a ruling on an in limine motion. Ordinarily, such an interlocutory ruling is not appealable and must await entry of a final judgment to secure review by an appellate court. (*Alan v. American Honda Motor Co., Inc*. (2007) 40 Cal.4th 894, 901; *Babb v. Superior Court* (1971) 3 Cal.3d 841, 851; 9 Witkin, Cal. Procedure (8th ed. 2008) Appeal, § 119, p. 183.) [9] The ordinary processes of an appeal are therefore not an

_____

application of 1918 "gift made in contemplation of death" statute to gift made in 1916 by donor who died in 1920]; *Licari v. Comr. of Int. Rev*. (9th Cir. 1991) 946 F.2d 690 [upholding 1986 increase of penalty for understating tax owed from 10 percent to 25 percent to returns filed in 1982-1984].) Given that we agree with the purely statutory approach of respondent court's decision, we also express no opinion on this constitutional question, which neither the FTB nor Quellos address in their briefs.

[9] To be fair, the FTB and Quellos anticipated this problem. Initially respondent court was favorably disposed to their suggestion that, in accordance with Code of Civil Procedure section 166.1, it would "indicate in any interlocutory order a belief that there is a controlling question of law as to which there are substantial grounds for difference of opinion, appellate resolution of which materially advance the conclusion of the litigation." Respondent court subsequently declined to take this step, erroneously believing that its "ruling was a final judgment."

After respondent court issued its statement of decision, the FTB filed two notices of appeal from it. (A134901, A134794.) We inquired of the parties whether the ruling constituted an appealable order. Quellos responded: "Quellos believes that the superior court's Statement of Decision was not a final judgment and thus an appeal therefrom does

8

adequate remedy at this time. (Code Civ. Proc., § 1086; 8 Witkin, Cal. Procedure, *supra*, Extraordinary Writs, §§ 116, p. 1009 & 127, p. 1020.) But expedited review is sometimes permitted in exceptional circumstances. Here, the issue is whether Quellos' collective liability is $2,000 or almost $27 million with similar disparities present in the follow-on cases to this case. This, as described by the FTB, presents a strong case for extraordinary interlocutory review:

"The Board has assessed increased section 19177 penalties post-2004 against not just these plaintiffs, but also against numerous entities in the banking, accounting and financial management community who promoted abusive tax shelters to multitudes of taxpayers pre-2004, At least 1525 transactions and $300,000,000 in total penalties are at stake. [10] The trial court's ruling is the first judicial decision on the issue, and it is being

not lie. However, because writ review could prevent a costly and unnecessary trial and resolve an important legal issue of first impression, Quellos supports writ review, provided that it is given an opportunity to provide full briefing in response to the writ petition filed by the Franchise Tax Board." The purported appeals were thereafter dismissed.

[10] The amounts of money mentioned in connection with abusive tax shelters are truly staggering. A prominent feature of the 2003 enactments was an amnesty program, known as the voluntary compliance program, which started on January 1, 2004 and ended on April 15, 2004. (§§ 19751-19752, added by Stats. 2003, ch. 654, § 13; Stats. 2003, ch. 656, § 13.) As required by the 2003 enactments (Stats. 2003, ch. 654, § 16; Stats. 2003, ch. 656, § 16), the Legislative Analyst reported to the Legislature that this program was anticipated to produce approximately $230 million, but actually resulted in "over $1.4 billion," with "an average participant payment of over $1 million." (Legis. Analyst, Abusive Tax Shelters: Impact of Recent California Legislation (Jan. 27, 2006), pp. 11-12, available online at <http://www.lao.ca.gov/2006/ abusive_tax_shelters_ 012706> [as of Nov. 20, 2013.) Professor Bankman's figures are slightly different, but equally impressive: "The amnesty was forecast to bring in $90 million. It in fact took in $1.3 billion—all this from around 1,000 taxpayers. Grossing that figure up from the marginal rate of tax owed by such taxpayers under existing rates in California, that $1.3 billion in tax payments represented about $15 billion dollars of underreported income." (Bankman, *Tax Enforcement: Tax Shelters, The Cash Economy, and Compliance Costs* (2005) 31 Ohio N.U.L.Rev. 1, 2, fn. omitted.)

One of the authors of the 2003 enactments stated: "Abusive tax shelters cost the federal government over $10 billion a year in tax revenue. Here in California, the Franchise Tax Board estimates that illegal tax shelters cost the state as much as $500

closely followed by the Board and other promoters subject to these same promoter penalties. [¶] Without an expeditious appellate resolution, the parties will have to litigate Quellos' liability—a process that would involve months of discovery, motion practice, and ultimately a protracted trial—even if the final result would only be a $1000 penalty. For the same reasons, if writ review is not accepted now, numerous other actions involving increased promoter penalties will also have to determine the legality of the penalty amount over and over again, as well as each promoter's liability for each individual transaction, even if the penalty is ultimately determined by this Court to be $1000 per transaction. A quick and final appellate resolution of the legality of the penalty amount now would result in the streamlining, and in many cases the virtual elimination of many similarly situated cases." And, "If review is not granted it will take months of expensive, protracted litigation before any appealable judgment can be entered. To conduct a liability trial simply to generate an appealable judgment would be a waste of resources and truly inefficient, especially when the appellate court could review the core legal issue on an extraordinary writ [petition]." Although disagreeing as

---

million a year. [¶] AB 1601 is needed to recoup this lost tax revenue. This bill will provide the Franchise Tax Board with better tools for investigating illegal tax shelters and prosecuting those offenders who use these tax shelters to reduce their tax liability. [¶] . . . This bill is necessary to change the cost-benefit analysis that leads filers to skirt the tax code and cheat the state of critical resources." (Sen. Com. on Revenue & Taxation, Analysis of Assem. Bill No. 1601 (1993-1994 Reg. Sess.) as proposed to be amended July 9, 2003, pp. 4-5.)

Also, shortly after the 2003 enactments were passed, the Legislative Analyst concluded: (1) federal revenue losses during the nine-month period January-September 2003 was estimated at $85 billion; (2) "tax shelter activity by corporations reduced state revenues nationwide in the range of $8 billion to $12 billion in 2001-02; and (3) "The FTB has recently increased its own estimate of the revenue impact of ATS [abusive tax shelter] transactions from a total of $2 billion over the last four years . . . to something in the range of $2.4 billion to $4 billion." ("The Problem of Abusive Tax Shelters" in Leg. Analyst, Rep. to Joint Legis. Budget Com., 2004-2005 Budget: Perspectives and Issues, pp. 217-218, available online at <http://www.lao.ca.gov/laoapp/pubdetails.aspx?id =1097> [as of Nov. 20, 2013].)

to some details, Quellos concurs that expedited review is both "warranted" and "needed" to consider this "important legal issue of first impression."

It thus appears all of the points raised by the FTB come within the following formulation: "Relief by mandamus is appropriate where it will prevent a needless, expensive trial and an ultimate reversal [citation], particularly where the issue presented is purely one of law and it is in the public interest to have a prompt settlement of the question presented [citations]." (*City of Huntington Beach v. Superior Court* (1978) 78 Cal.App.3d 333, 339; see 8 Witkin, Cal. Procedure, *supra*, Extraordinary Writs, §§ 134-135, pp. 1028-1033 and decisions cited.) A final factor favoring accelerated consideration is that it will let state authorities know if they may budget for future income generated by retroactive application of the 2003 version of section 19177. For each and all of these considerations, we conclude that speedy review is appropriate.

## The Nature Of The Problem

Our Supreme Court has held that there is a "strong presumption" against applying a statute retroactively. (*McClung v. Employment Development Dept*. (2004) 34 Cal.4th 467, 475.) The court elaborated: " 'Generally, statutes operate prospectively only.' [Citations.] '[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly . . . . For that reason, the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." ' [Citations.] 'The presumption against statutory retroactivity has consistently been explained by reference to the unfairness of imposing new burdens on persons after the fact.' [Citation.] [¶] This is not to say that a statute may never apply retroactively. '[A] statute's retroactivity is, in the first instance, a policy determination for the Legislature and one to which courts defer absent "some constitutional objection" to retroactivity.' [Citation.] But it has long been established that a statute that interferes with antecedent rights will not operate retroactivity unless such retroactivity be 'the

11

unequivocal and inflexible import of the terms, and the manifest intention of the legislature.' [Citations.] '[A] statute may be applied retroactively only if it contains express language of retroactivity *or* if other sources provide a clear and unavoidable implication that the Legislature intended retroactive application. [Citation.]" (*Ibid.*) Ambiguous statutory language will not suffice to establish such an intent. (*Myers v. Philip Morris Companies, Inc*. (2002) 28 Cal.4th 828, 841.)

A statute is deemed to be retroactive if it *substantially* changes the legal consequences of past events. (*Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 230-231; *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243; *River Garden Retirement Home v. Franchise Tax Board* (2010) 186 Cal.App.4th 922, 956-957.) "Phrased another way, a statute that operates to 'increase a party's liability for past conduct' is retroactive." (*Myers v. Philip Morris Companies, Inc.*, *supra*, 28 Cal.4th 828, 839, quoting *Landgraf v. USI Film Products* (1994) 511 U.S. 244, 280.) " 'If so, then application to . . . preenactment conduct is forbidden, absent an express legislative intent to permit such retroactive application.' " (*Californians for Disability Rights v. Mervyn's, LLC*, *supra*, at p.231, quoting *Elsner v. Uveges* (2004) 34 Cal.4th 915, 936.)

"Laws which . . . exact new penalties because of past transactions" qualify as retroactive measures. (*Pignaz v. Burnett* (1897) 119 Cal. 157, 160; accord, *In re Marriage of Reuling* (1994) 23 Cal.App.4th 1428, 1439; *Helm v. Bollman* (1959) 176 Cal.App.2d 838, 841.) Increasing Quellos' collective fines from $2,000 to almost $27 million satisfies any definition of a *substantial* change in the liability Quellos may face for actions taken in 2001. The operative question is whether this increase was intended to be retroactive by the Legislature when it enacted the 2003 enactments amending section 19177. This inquiry involves a pure issue of law to which we bring our independent, de novo review. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311; *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)

12

## Our Resolution Of The Problem

The FTB and Quellos expend considerable effort in parsing and analyzing the language of section 15(a), which figured prominently in respondent court's statement of decision. Indeed, the FTB commences its argument by telling us that "principles of statutory construction compel a reading of section 15(a) that applies the increase in the promoter penalty to all assessments issued on or after January 1, 2004." But the FTB is putting the cart before the horse.

The issue of whether the 2003 version of section 19177 is retroactive is initially approached by looking to nothing but the actual language of that statute. We recently explained the steps in the process for ascertaining statutory meaning:

"When interpreting a statute, '[o]ur fundamental task . . . is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute.' [Citation.] When determining what the Legislature meant, ' "[t]he statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation." ' " [Citation.]" (*Dacey v. Taraday* (2011) 196 Cal.App.4th 962, 979-980.)

The plain language of the 2003 version of section 19177 is silent on the issue of retroactivity. Simply put, there are no words indicating that the Legislature even considered the issue. Thus, the statutory language of section 19177 has "nothing . . . to overcome the strong presumption against retroactivity." (*McClung v. Employment Development Dept.*, *supra*, 34 Cal.4th 467, 475.) But we do not choose to halt our analysis here.

As previously shown, all versions of section 19177 have retained the reference to "Section 6700 of the Internal Revenue Code." This incorporation makes it proper to

13

consult the federal statute for whatever pertinency it may have on the issue of retroactivity. (See § 9 ["Whenever any reference is made to any portion of this code or any other law, the reference applies to all amendments and additions thereto now or hereafter made"]; *Droeger v. Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 50 ["even though a statute may appear to be unambiguous on its face, when considered in light of closely related statutes a legislative purpose may emerge that is inconsistent with, and controlling over, the language read without reference to the entire scheme of the law"]; 2B Singer & Singer, Statutes and Statutory Construction (7th ed. 2012) Interpretation by Reference to Related Statutes, §§ 51:7-51:8, pp. 306-315.)[11] That consultation, too, is fruitless, because in none of its versions (see legislative materials cited at fn. 2 and accompanying text, *ante*) has Congress ever inserted language evidencing an intent for retroactive application.

But here there is an unusual wrinkle: the uncodified section 15 enacted with the 2003 version of section 19177. Both the FTB and Quellos treat the language of the uncodified section 15 as highly pertinent, if not dispositive. This assumption will be likewise indulged. (*Droeger v. Friedman, Sloan & Ross*, *supra*, 54 Cal.3d 26, 50.)

We recently explained that uncodified language such as section 15 "is known as a 'plus section,' which our Supreme Court termed 'a provision of a bill that is not intended to be a substantive part of the code section or general law that the bill enacts, but to express the Legislature's view on some aspect of the operation or effect of the bill. Common examples of "plus sections" include severability clauses, saving clauses, statements of the fiscal consequences of the legislation, *provisions giving the legislation immediate effect or a delayed operative date* or a limited duration, and provisions declaring an intent to overrule a specific judicial decision or an intent not to change

---

[11] Moreover, because California's Personal Income Tax Law (§ 17001 et seq.) "generally is based upon federal income law" (*Ordlock v. Franchise Tax Bd.* (2006) 38 Cal.4th 897, 901, 904), ordinarily a good deal of deference is given to federal interpretation of similar terms and concepts. (See 9 Witkin, Summary of Cal. Law (10th ed. 2005) Taxation, § 332, p. 477 and decisions cited.)

existing law.' (*People v. Allen* (1999) 21 Cal.4th 846, 858–859, fn. 13.)  The court subsequently explained that 'statements of the intent of the enacting body . . . , while not conclusive, are entitled to consideration.  [Citations.]  Although such statements in an uncodified section do not confer power, determine rights, or enlarge the scope of a measure, they properly may be utilized as an aid in construing a statute.'  (*People v. Canty* (2004) 32 Cal.4th 1266, 1280.)"  (*Sequoia Park Associates v. County of Sonoma* (2009) 176 Cal.App.4th 1270, 1287, fn. 8, italics added.)

"An uncodified section is part of the statutory law."  (*Carter v. California Dept. of Veterans Affairs* (2006)  38 Cal.4th 914, 925.)  Because uncodified section 15 and the 2003 version of section 19177 obviously deal with the subject of penalizing abusive tax shelters, it is appropriate to construe them together, an approach that " ' "is most justified and . . . has the greatest probative force, in the case of statutes relating to the same subject that were passed at the same session of the legislature, especially if they were approved or take effect on the same day . . . ." ' "  (*International Business Machines v. State Bd. of Equalization* (1980) 26 Cal.3d 923, 932.)  That is certainly the case with the virtually identical 2003 enactments.  (See fn. 5, *ante*.)

According to the Board, income for promoting an abusive tax shelter is usually discovered from an examination of the taxpayer's return, and then backtracked to the promoter, a process that commonly takes years.  Thus, as the FTB puts it, "here, the Board assessed the promoter penalty against Quellos in 2009, although the promoters' . . . activities occurred in 2001.  That is because it took years for the Board to determine if a tax abuse scheme took place, and if tax advisors participated in the promotion of that scheme."  It follows, as the Board concedes, the section 19177 penalty is not one "assessed . . . on [a] return" within the meaning of the first sentence of section 15(a).  This accords with the construction given the federal counterpart to section 19177.  (See *Sage v. United States* (5th Cir. 1990) 908 F.2d 18, 24-25 [" 'Section 6700 assessments do not depend on the filing of a tax return' "].)

However, the Board first maintains the increased penalty is still within this sentence because it is "assessed" on or after January 1, 2004, and therefore "necessarily

15

include[s] penalties imposed as a result of activities conducted prior to January 1, 2004." As the Board elaborates: "The key term in that [part of] section 15(a) is the word 'apply.' Black's Law Dictionary defines 'apply' to mean 'to employ' or 'to put to use with a particular subject matter.' [Citation.] Applying or employing the increased penalty rate on or after January 1, 2004 to the section 19177 penalty means that *all* section 19177 penalties assessed on or after January 1, 2004 must reflect the increased penalty amount. [¶] By finding that the second sentence expresses a prospective-only application, the superior court in effect ruled that that the increased penalty provisions apply only to penalties for activities that occurred on or after January 1, 2004. However, such a reading is contrary to law because that interpretation would require this Court to insert the words 'to activities' into the language of the statute. This the Court cannot do."

The Board's next argument segues from "activities" to "taxable years." The argument begins with the premise of respondent court's "implied finding that the 2003 amendments to section 19177 apply to 'activities' that occur on or after January 1, 2004." The Board submits that such a determination "is equivalent to saying that [the second sentence of section 15(a) is] applicable for the taxable years beginning January 1, 2004. But section 15(a) does not include any references to taxable years. In fact, it is the very absence of the words 'to activities' or 'taxable years beginning January 1, 2004' that reinforces the conclusion that the Legislature did not intend to delay application of the increased penalty rate until penalties are assessed for activities that occurred on or after January 1, 2004.

"The Revenue and Taxation Code provides that unless a legislative act 'otherwise specifically provided therein,' the provisions of an act which affect the imposition of taxes or penalties 'shall be applied to the *taxable years beginning* on or after January 1 of the year in which the act takes effect.' (§ 18415, subd. (a), (emphasis added).)[12] Here,

_____

[12] The cited statute provides: "Unless otherwise specifically provided therein, the provisions of any act: [¶] (a) That affect the imposition or computation of taxes, additions to tax other than Sections 19136 or 19142 [dealing with payment of estimated income tax], penalties, or the allowance of credits against the tax, shall be applied to

16

section 15(a) did otherwise specially provide.  Had section 15(a) not specifically stated that the act's provisions applied on or after January 1, 2004, the increased penalty amendments to section 19177 would have been applicable to the *taxable years beginning* January 1, 2004, pursuant to section 18415.  The Legislature's intentional use of language specifically providing for a different application date reflects the Legislature's intention for that date to apply, and for the general provisions set forth in section 18415 to be overridden."

The Board maintains that "[t]he absence of any reference to the 'beginning of a taxable year' is underscored by the fact that the Legislature included the phrase 'beginning of a taxable year' in section 15(b) and (c) when other penalties went into effect, but did not include that term in section 15(a).  'It is an equally settled axiom that when the drafters of a statute have employed a term in one place and omitted it in another, it should not be inferred where it has been excluded.'  (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1010.)  Had the Legislature intended to apply the increased promoter penalties beginning as of taxable year 2004, it would have said so.  But it did not."

Finally, citing legislative history materials demonstrating the Legislature's supposed desire for "immediate action" against "*all* of the players in the abusive tax shelter industry," the Board contends the second sentence of section 15(a) demonstrates that "the Legislature intended to make the amendments to section 19177 apply to all promoter penalties assessed on or after January 1, 2004, including those penalties based on promoter activities that occurred prior to that date."  "[T]he public policy that compelled the Legislature to become a trailblazer in the area of tax shelter reform could only be effectuated if the increased penalties were applied immediately to all assessments, including those for past conduct."  Any other construction would, in the Board's view, produce the absurd result of the most culpable participant in abusive

taxable years beginning on or after January 1 of the year in which the act takes effect." (§ 18415, subd. (a).)

17

shelters escaping with only the risible penalty of $1,000.

The Board's arguments are creative, and are obviously the product of considerable thought. They are not, however, persuasive.

Although section 15(a) has received most of the FTB's and Quellos' attention, the entirety of section 15 merits quotation in full:

"(a) Unless otherwise provided, this act shall apply with respect to any penalty assessed on or after January 1, 2004, on any return for which the statute of limitations on assessment has not expired. All other provisions of this act shall apply on or after January 1, 2004.

"(b) Except as provided in subdivision (c), Sections 18407, 19772, and 19773 of the Revenue and Taxation Code, as amended or added by this act, apply to taxable years beginning on or after January 1, 2003.[13]

"(c)(1) The penalty provisions of Section 19772 apply to any person that satisfies both of the following:

"(A) The person is subject to the provisions of Sections 18407 and 19772.

"(B) The person has invested in a transaction after February 28, 2000, and before January 1, 2004, where that transaction becomes a listed transaction at any time.

"(2)(A) A person that is subject to the provisions of Section 611 of the Internal Revenue Code as incorporated and modified by Section 18648,[14] must register a tax shelter with the Franchise Tax Board before April 30, 2004, if that tax shelter was offered

---

[13] In broad strokes, the cited provisions specify that California will generally use the federal terminology and requirements governing reporting tax shelters (§ 18407), and will penalize taxpayers who fail to include on their returns "any information with respect to a reportable transaction" required on a federal return (§ 19772) or if a reportable transaction is understated (§ 19773). All of these provisions were added by the 2003 enactments. (Stats. 2003, ch. 654, §§ 1, 13; Stats. 2003, ch. 656, §§ 1, 13.)

[14] Another addition of the 2003 enactments, this directs that "Section 6112 of the Internal Revenue Code, relating to organizers and sellers of potentially abusive tax shelters must keep lists of investors, applies except at otherwise provided." (§ 18648, subd. (a), added by Stats. 2003, ch. 654, § 4; Stats. 2003, ch. 656, § 4.)

for sale between February 28, 2000, and January 1, 2004, and becomes a listed transaction on or before January 1, 2004.

"(B) The penalty under Section 19173[15] applies for a failure to register the tax shelter under subparagraph (A).

"(3)(A) Subdivision (c) of Section 18648 does not apply to licensed attorneys in the case of a transaction that was entered into before January 1, 2004, if the attorney is considered a material advisor solely due to the practice of law.

"(B) The provisions of subparagraph (A) shall only apply to an attorney offering advice in an attorney-client relationship where:

"(i) Legal advice of any kind is sought from a professional legal adviser in his or her capacity as a professional legal adviser;

"(ii) The communications are made in confidence and relate to that purpose; and

"(iii) The communications are made or received by the client.

"(4) For purposes of applying Section 19778 of the Revenue and Taxation Code,[16] section 18407 of the Revenue and Taxation Code, as added by this act, applies for taxable years beginning after December 31, 1998." (Stats. 2003, ch. 654, § 15; Stats. ch. 656, § 15.)

The function of section 15 is obvious. The 2003 enactments did not involve a single statute, but a systematic adjustment of the entire subject of abusive tax shelters.

---

[15] Specifically, $100,000 for failing to register a tax shelter or provide "the same information required for federal tax shelters." (§ 19173, amended by Stats. 2003, ch. 654, § 8; Stats. 2003, ch. 656, § 8.) The quoted language is from section 18628 as it was amended by the 2003 enactments. (Stats. 2003, ch. 654, § 2; Stats. 2003, ch. 656, § 2.)

[16] "For any amended return filed after April 5, 2004, and before the taxpayer is contacted by the Internal Revenue Service or the Franchise Tax Board regarding a potentially abusive tax shelter, then, for taxable years beginning after December 31, 1998, with respect to any understatement of tax related to using reportable transactions as defined in Section 18407, as added by the act adding this section, the taxpayer is subject to interest as provided under Section 19101 but at a rate of 150 percent of the adjusted annual rate established under Section 19521." (§ 19778, added by Stats. 2003, ch. 654, § 13; Stats. 2003, ch. 656, § 13.)

Many of the provisions concerned the specification of the new duties imposed on a variety of parties, and in numerous instances the Legislature specified when the new duties would take effect. [17] Equally prominent was a number of new or increased penalties imposed on those parties. [18] Rather than insert language addressing retroactivity

[17] Examples are: Stats. 2003, ch. 654, § 2, Stats. 2003, ch. 656, § 2 [amending § 18628, subd. (h) to require shelter promoters to register shelters "entered into on or after February 28, 2000"]; Stats. 2003, ch. 654, § 4, Stats. 2003, ch. 656, § 4 [adding § 18648, subds. (d)(3), (d)(4) to require shelter promoters to maintain list of investors for one type of transaction "entered into on or after February 28, 2000" and for another type of transaction if "entered into on or after September 2, 2003"]; Stats. 2003, ch. 654, § 5, Stats. 2003, ch. 656, § 5 [amendment of § 19116 concerning the FTB's power to assess interest or additional tax "shall apply to taxable years ending after October 10, 1999"]; Stats. 2003, ch. 654, § 6, Stats. 2003, ch. 656, § 6 [amending § 19164, subd. (d)(2) (iii) to require shelter-related taxpayer disclosure "[f]or taxable years beginning on or after January 1, 2003"]; Stats. 2003, ch. 654, § 11, Stats. 2003, ch. 656, § 11 [amending § 19504, subds. (c)(1), (e) concerning FTB subpoena and examination of taxpayer returns "beginning on or after October 10, 1999"]; Stats. 2003, ch. 654, § 13, Stats. 2003, ch. 656, § 13 [establishing amnesty program for "tax liabilities attributable to the use of abusive tax avoidance transactions for taxable years beginning before January 1, 2003"]; Stats. 2003, ch. 654, § 13, Stats. 2003, ch. 656, § 13 [fixing 150 percent interest rate "[f]or any amended return filed after April 15, 2004 . . . for taxable years beginning after December 31, 1998"].

[18] The 2003 enactments increased or added penalties as follows: (1) $1,000 if a tax return preparer does not have a reasonable belief in the tax treatment claimed (§ 19166, subd. (a)); (2) $5,000 if a tax return preparer is fraudulent or reckless in the tax treatment claimed (§ 19166, subd. (b)); (3) $5,000 if a taxpayer submits a frivolous return (§ 19179, subd. (b)(1)); (4) $10,000 per day if a material advisor fails to provide information requested by the FTB within 20 days (§ 19173, subd. (b)(2)(A)); (5) $15,000 if a material advisor fails to maintain or report specified information (§ 19173, subd. (b)(1)); (6) $15,000 if a "large entity or high net worth individual" taxpayer fails to disclose a "reportable transaction" (§ 19772, subd. (b)(1)); (7) $30,000 if a "large entity or high net worth individual" taxpayer fails to disclose a "listed transaction" (§ 19722, subd. (b)(2)); (8) a material advisor or organizer who fails to maintain information about a listed transaction is penalized the greater of $100,000 or 50 percent of the gross income "derived from that activity" (§ 19173, subd. (b)(1)(B)), 75 percent if the omission is the result of "intentional disregard" ((§ 19173, subd. (b)(1)(C); (9) a taxpayer who makes an "reportable transaction understatement"—which amounts to an inaccurate claim on an adequately disclosed reportable transaction" is penalized 20 percent of the understatement (§ 19773, subd. (a)), and 30 percent if the transaction is not adequately

20

into each of these provisions, the Legislature obviously elected to use section 15 as a collection point for a number of determinations concerning the scope of application. Clearly, this was not an instance where the legislative intention must be divined from a complete silence or lack of expression.

No less apparent is that the Legislature rejected the idea of a single universal rule of retroactive application. Instead, section 15 very clearly reflects a number of considered decisions by the Legislature as to what new or enhanced duty should receive what specific penalty commencing on what specific date.

The FTB's first two arguments, each of which seize upon a single word, will not detain us long. The first is built entirely on the word "assessed," the second on the word "apply," both in the language "this act shall apply with respect to any penalty assessed on or after January 1, 2004, on any return for which the statute of limitations on assessment has not expired." Both of these arguments isolate one word and ignore the rest of the language—and thus the context. This is contrary to bedrock principles of statutory construction. (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83; *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1040.) The language of the entire sentence can only be read as dealing with the assessment of "any penalty . . . on any return," which the FTB advises is not what happens with shelter promoters. The simple fact that an assessment may be on someone or after January 1, 2004 is irrelevant to whether  a non-return based

disclosed (§ 19773, subd. (c)(1)); (10) a taxpayer that has been contacted by the FTB "regarding the use of a potentially abusive tax shelter" has "a substantial understatement of tax" and be penalized 20 percent of the amount understated (§ 19164, subds. (a)(3), (a)(5)); (11) "If a taxpayer has a noneconomic substance transaction understatement for any taxable year, there shall be added to the tax an amount equal to 40% of the amount of the transaction," but only 20 percent if "the relevant facts affecting the tax treatment of the item are adequately disclosed in the return or a statement attached to the return"(§ 19774, subds. (a),(b)(1)); (12) a taxpayer who has been contacted by the FTB "regarding the use of a potentially abusive tax shelter, and has a deficiency, there shall be added to the tax an amount equal to 100% of the interest payable" (§ 19777, subd. (a)); and of course (12) the promoter penalty of section 19177.

penalty is to be imposed on the promoter. And the proper context for "apply" is again "any penalty assessed on . . . any return."

The Board's next argument appears but a variation on the first, assuming as it does that "application" is still dependent upon a return-based penalty, even if this does "necessarily include penalties imposed as a result of activities conducted prior to January 1, 2004." If the Board means to suggest that so long as a *taxpayer's* return remains liable for a penalty assessment (a period that can be quite extensive), [19] the *promoter* is subject to a co-extensive period of vulnerability, this is untenable bootstrapping. Such vicarious liability tortures beyond any reasonable endurance the language of section 15(a)'s first sentence. It makes nonsense of the sentence's central emphasis—the existence of a penalty "assessed on . . . . [a] return." And it cannot be

---

[19] If the FTB believes the taxpayer has underpaid, it can seek more money with a deficiency assessment. "Except in the case of a false or fraudulent return . . . , every notice of a proposed deficiency assessment shall be mailed to the taxpayer within four years after the return was filed." (§ 19057, subd. (a).) The federal rule is three years. (26 U.S.C. § 6501, subd. (a).) If the FTB believes the taxpayer has understated his or her gross income by more than 25 percent, "a notice of proposed deficiency assessment may be mailed to the taxpayer within six years after the return was filed." (§ 19058, subd.(a).) On the other hand, the IRS apparently has no time limit for reexamining federal returns (see *Ordlock v. Franchise Tax Bd*., *supra*, 38 Cal.4th 897, 902 [taxpayers' 1983 return, timely filed in 1984, still being examined by IRS in 1996]) or assessing the federal promoter penalty. (*Sage v. United States*, *supra*, 908 F.2d 18, 24-25.) If the IRS determines that the taxpayer's federal income and liability amounts should be increased, the taxpayer is required to report this to the FTB. (§ 18622, subd. (a).) If the taxpayer does so, the FTB has up to six years to issue a deficiency assessment. However, if the taxpayer does not so advise the FTB, there is no time limit for FTB action. (See *Ordlock v. Franchise Tax Bd*., *supra*, at pp. 908-909, 912 [if taxpayers fail to comply with § 18622's duty to report FTB is "authorized [by § 19060] to mail notice of the proposed deficiency assessment *at any time*"]; Assem. Com. on Revenue and Taxation, Analysis of Sen. Bill No. 614 (2003-2004 Reg. Sess.) as amended June 2, 2003, p. 14 ["the FTB is given unlimited time if a federal audit discovers income not reported on a taxpayer's state income tax return"].)

We emphasize that here we are concerned with when the period of the promoter's exposure commences, not with how long it lasts.

22

squared with the Board's position that section 19177's penalty is not within this language.

The Board's argument about "taxable years" is equally groundless. It is predicated upon a supposed "implied finding" made by respondent court, as if such a finding would control our analysis. However, as already noted, that analysis is independent and de novo. (*In re Tobacco II Cases*, *supra*, 46 Cal.4th 298, 311; *People ex rel. Lockyer v. Shamrock Foods Co.*, *supra*, 24 Cal.4th 415, 432.) True, as the Board argues, "section 15(a) does not include any references to taxable years," but that is the function of section 18415, which inserts such a reference by operation of law. It is only when the Legislature intends a different date that it makes that intent clear with specific language, which, as the Board notes, was done with sections 15(b) and 15(c)(4). So, when the Board argues that "[t]he absence of . . . language providing that provisions apply as of a particular taxable year reinforces the conclusion that the Legislature intended the [the 2003 version of section 19177] to apply immediately," the Board is reversing the correct interpretation and application of section 18415. The absence of "taxable year beginning on or after January 1, 2004" attached to the 2003 version of section 19177 therefore lacks the legal consequence claimed by the Board with its citation to *People v. Woodhead*, *supra*, 43 Cal.3d 1002.

If anything, the Board's logic works against its argument because the absence of language in section 15(a) of a taxable year other than the one beginning January 1, 2004 must be accounted as evidence the Legislature did not intend the 2003 version of section 19177 to apply to any earlier taxable years. Which, as the Board points out, the Legislature did in section 15(b): "Sections 18407, 19772, and 19773 . . . as amended or added by this act, apply to taxable years beginning on or after January 1, 2003." And in section 15(c)(4): "For purposes of applying section 19778 . . . , section 18407 . . . as added by this act, applies for taxable years beginning after December 31, 1998." To quote the Board: "Had the Legislature intended to apply the increased promoter penalties [prior to the] taxable year 2004, it would have said so. But it did not." Accordingly, the

23

absence of a reference to taxable year, and an express connection to section 19177, must work against the Board's contention that retroactive application was intended.

We have inspected the voluminous legislative histories of the 2003 amendments and found virtually nothing supportive of the Board's arguments. The FTB fails to draw our attention to anything showing that the Legislature was aware of the delay in ascertaining the identity of shelter promoters entailed by FTB's administrative procedures, much less that this situation was intended to be addressed by any part of section 15.[20] Granted, given the peculiar evolution of the 2003 enactments (see fn. 5, *ante*), much of this material is repetitive and overlapping. And much is devoted to the need for action, the scope of the proposed measures vis-à-vis parallel federal legislation, and the mechanics and expectations of the amnesty program. (See fn. 10, *ante*.) As may be gathered from the gigantic escalation in penalties imposed by the 2003 version of 19177, the promoters of abusive tax shelters did not escape attention.[21] As the FTB

---

[20] Indeed, it appears that at least one committee of the Legislature believed there was a different path of discovering abusive tax shelters that commenced with the promoter, not the taxpayer: "This bill also increases the penalties on those who fail to register their tax shelters with the state. Increasing the penalties for failure to register a shelter is intended to help FTB keep track of all tax shelter products being promoted. *Determination of whether a tax shelter is legal or illegal begins with an understanding of how it works, information that is provided when a shelter is registered*." (Assem. Com. on Revenue and Taxation, Analysis of Assem. Bill No. 1601 (2003-2004 Reg. Sess.) as amended April 10, 2003, p. 5, italics added; accord, Assem. Com. on Revenue and Taxation, Analysis of Assem. Bill No. 1601 (2003-2004 Reg. Sess.) as amended May 19, 2003, p. 5.)

[21] There is considerable evidence, at least at the federal level, that promoters of abusive tax shelters have been deemed more culpable than investors. (E.g., Sen. Rep. No. 97-494, 1st Sess., p. 266 (1982), reprinted in 1982 U.S. Code Cong. & Admin. News, p. 1014; *United States v. Estate Preservation Services* (9th Cir. 2000) 202 F.3d 1093, 1099; *United States v. Schulz* (N.D.N.Y. 2007) 529 F.Supp.2d 341, 352; *Manko v. United States* (S.D.N.Y. 1998) 1998 WL 391129 * 6; see Governmental Attempts to Stem the Rising Tide of Corporate Tax Shelters (2004) 117 Harv. L. Rev. 2249, 2253 [describing promoters as "[t]he tax shelter industry's major players" who produce " 'tax products'— rather than tax advice—which are easily duplicated . . . but can be extraordinarily lucrative "]) The Legislature appears to have initially been of the same mind, setting the penalty rate for promoters at 25 percent (Assem. Com. on Revenue and Taxation,

repeatedly states, the 2003 enactments represented a "comprehensive" and "multi-faceted effort" by the Legislature that included "increased penalties against *all* of the players in the abusive tax shelter industry—taxpayers (investors), tax preparers, tax advisors and promoters." That broad front approach is also reflected in section 15 which is devoted exclusively to the issue of retroactivity.

Look at the language of section 15. Really look at it, all of it. Section 15 is a honeycomb of disparate decisions reflecting that the Legislature considered the issue of retroactivity from many different angles. The Legislature did not adopt a single standard for retroactivity. Instead, it chose multiple, and differing, chronological points at which different obligations and penalties would commence. In light of this comprehensive approach, it would be difficult to maintain that the Legislature inadvertently omitted something.

Promoter penalties were not neglected in section 15. Sections 15(c)(2)(A) and 15(c)(2)(B) clearly specify that promoters are to be penalized for failing to register a tax shelter if the shelter "was offered for sale between February 28, 2000, and January 1,

---

Analysis of Assem. Bill No. 1601 (2003-2004 Reg. Sess.) as amended April 10, 2003, p. 1), before raising it to 50 percent (Sen. Com. on Revenue and Taxation, Analysis of Assem. Bill No. 1601 (2003-2004 Reg. Sess.) for hearing July 9, 2003, p. 5 ["This bill was amended to parallel exactly the penalty provisions in SB 614"]; Sen. Com. on Appropriations, Fiscal Summary Analysis of Assem. Bill No. 1601 (2003-2004 Reg. Sess.) as amended Aug. 18, 2003, p 2 ["The 8/18 amendments make the bill identical to SB 614"]), and excluding promoters from the ensuing limited-period amnesty. (See fn. 10, *ante*.) Professor Bankman, who assisted in drafting the 2003 enactments (see Bankman, *Tax Enforcement: Tax Shelters, The Cash Economy, and Compliance Costs*, *supra*, 31 Ohio N.U.L.Rev.1, 5; Sen. Com. on Revenue & Taxation, Analysis of Assem. Bill No. 1601 (1993-1994 Reg. Sess.) as amended April 21, 2003, p.8) put it this way: "[T]he industry is thought to revolve around a few sets of shelter creators and/or promoters . . . . [¶] A number of observers have argued that any approach to tax shelters must center around the role of advisors in general, and in particular, the promoters. 'Go after the promoters and you will see the shelters disappear[.]' . . . As noted . . . promoters . . . have played a primary role in the recent growth of the shelter industry." (Bankman, *The New Market in Corporate Tax Shelters*, *supra*, Tax Notes 1775, 1780, 1790.) But see the author's statement quoted at footnote 10 *ante* indicating a taxpayer-oriented approach.

25

2004." Meanwhile, subdivision (c)(1)—and section 19772 that it references—penalizes *taxpayers* who fail to report income from a shelter *for almost that exact same period*. Had the Legislature intended to impose section 19177 penalties on promoters for the taxable years 2000 through 2004, as the FTB contends it did, one would logically expect such intent to be expressed in close vicinity to this language. Or, of course, in section 19177 itself. Yet such language is missing from both locations. And, as the Board reminds us, it is not for us to read it in. (*People v. Woodhead*, *supra*, 43 Cal.3d 1002, 1010; cf. *Samantar v. Yousuf* (2010) 560 U.S. 305, __ [130 S.Ct. 2278, 2288] [" 'Drawing meaning from silence is particularly inappropriate [when] Congress has shown that it knows how to [address an issue] in express terms' "].)

Both before respondent court, and here, the FTB places considerable emphasis on the argument that retroactive application of the 2003 version of section 19177 will advance the Legislature's goal of deterring the use of abusive tax shelters. Undoubtedly it would. But the issue here is whether a clear and unmistakable intent to promote that objective can be discerned from the language of section 15, more particularly, the silence of section 15. It cannot. As already pointed out, the Legislature did not employ the necessary language it did in other places in section 15 evidencing its intent for retroactivity.

It is pertinent to note that in one crucial aspect the Legislature treated *taxpayers* with unique severity, doubling the statute of limitations for deficiency assessments from four to eight years, and specifically providing that this change "shall apply to any return filed under this part on or after January 1, 2000." (Stats. 2003, ch. 654, § 13; Stats. 2003, ch. 656, § 13, adding § 19755.) The theory behind this change was "[l]engthening the statute of limitations on FTB's ability to issue deficiencies in cases involving the use of tax shelters is intended to allow FTB to pursue individuals who used tax shelters that were found to be illegal after the end of the current four-year statute of limitations." (Assem. 3d Reading Analysis of Assem. Bill No. 1601 (2003-2004 Reg. Sess.) as amended May 19, 2003, p. 6.) Equivalent language was not directed at shelter promoters, nor added to the 2003 version of section 19177.

26

The situation may be summarized as follows:  The Legislature wanted to quash the burgeoning growth of abusive tax shelters by enacting a comprehensive scheme against all parties involved in that growth.  Increased penalties were a prominent feature, perhaps the most prominent, of that scheme, and the most draconian, section 19177, was aimed squarely at promoters of the shelters.  The Legislature's scheme was enacted with a provision, section 15, that dealt with the sole subject of whether, and to what extent, various features of the scheme would be retroactively applied.  In that provision, the Legislature expressly authorized retroactive application of a penalty *against taxpayers*, as well as retroactive application of a new duty *on promoters* for the same period, 2001 to 2004.  But it did not provide for the equivalent retroactive reach for section 19177 for which the FTB now argues.

As citizens and taxpayers, we might debate whether the Legislature let shelter promoters too easily off the hook, and whether it is unfair to double the statute of limitations against taxpayers but not against promoters.  It might indeed seem absurd to make a promoter write a check for a thousand dollars when the taxpayer who bought the promoter's scheme will have to pay far more.  There is an undeniable logic to the Board's argument that taxpayers may be, relatively speaking, less culpable than promoters, so it might seem odd that enhanced penalties apply to taxpayers but not to promoters.  Such might strike many as a misguided approach to deterring the proliferation of abusive tax shelters.  Maybe the Legislature truly intended that, as between promoters and taxpayers, it should be the promoters who are more sternly disciplined.  Maybe that is a conclusion we would like to reach.  Certainly it is a conclusion that appears in the best interest of the California fisc.  But it is not a conclusion we can endorse.

Making such determinations and choices is what legislatures do; it defines the legislative function.  (E.g., *FCC v. Beach Communications, Inc*. (1993) 508 U.S. 307, 315-316; *United States v. Ptasynski* (1983) 462 U.S. 74, 82; *Warden v. State Bar* (1999) 21 Cal.4th 628, 645.)  As judges, the wisdom of such policy decisions, particularly when they address economic or financial considerations, is beyond our proper inquiry.  (See *Service Employees Internat. Union, Local 1000 v. Brown* (2011) 197 Cal.App.4th 252,

27

273 and decisions cited.) Retroactivity determinations are likewise " 'a policy determination for the Legislature and one to which courts defer "absent some constitutional objection" to retroactivity.' " (*McClung v. Employment Development Dept.*, *supra*, 34 Cal.4th 467, 475.) There is no such objection here. (See fn. 8, *ante*.)

There is no express language of retroactivity in the 2003 version of section 19177. There is no language in any part of the 2003 enactments that comes near rebutting the strong presumption against giving the 2003 version of section 19177 a retroactive application. Our careful examination of the legislative histories attending the 2003 enactments has disclosed nothing proving that retroactivity of the 2003 version of section 19177 was " 'the unequivocal and inflexible import of [its] terms and the manifest intention. . . .' [Citations.] '. . . that Legislature intended retroactive application.' " (*McClung v. Employment Development Dept.*, *supra*, 34 Cal.4th 467, 475.) Acceding to the FTB's construction of the 2003 version of section 19177 would amount to a wholly improper rewriting of that statute in the belief that this court knows what the Legislature really intended. (Code Civ. Proc., § 1858; *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 545; *Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 73-74; *People v. Woodhead*, *supra*, 43 Cal.3d 1002, 1010.) In quite properly refusing the FTB's invitation to do so, and by correctly recognizing that the second sentence of section 15(a) furnishes the controlling principle, respondent court committed no error of law necessitating extraordinary intervention.

**DISPOSITION**

The petitions are denied.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Brick, J.[*]

_____
[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28

Trial Court:                          Superior Court of the City and County of
                                      San Francisco

Trial Judge:                          Honorable Richard Kramer

Attorney for Petitioner:              Kamala D. Harris, Attorney General,
                                      Paul D. Gifford, Senior Assistant Attorney
                                      General, Joyce E. Hee, Supervising Deputy
                                      Attorney General, and Anne Michelle Burr,
                                      Deputy Attorney General

Attorney for Respondent:              No appearance for Respondent

Attorneys for Real Parties in Interest   Steptoe & Johnson, Matthew D. Lerner and
Quellos Group, LLC and Quellos Financial   Amanda Pedvin Varma.
Advisors, LLC: